[No. 29451. Department Two. May 8, 1945.]

MABEL DENNIS *et al., Respondents,* v. LOTTIE R. MCARTHUR *et al., Appellants.*[1]

[1]Reported in 158 P. (2d) 644.

34

*Arthur A. Giblin,* for appellants.

*Graham K. Betts,* for respondents.

MALLERY, J.—The defendant appeals from a judgment entered on a verdict by the jury for five thousand dollars for damages based on an action for malpractice.

Mabel Dennis brought her action against Lottie R. McArthur, sanipractic physician, practicing in Seattle. The spouses of the parties were joined in the action, but for simplicity Mabel Dennis and Lottie R. McArthur, who practices under the name of Lottie R. Boulls, will be referred to as if they were the sole respondent and appellant, respectively.

On February 13, 1940, the respondent, who was suffering from a backache, on the recommendation of a friend consulted the appellant professionally. No treatment was given on that visit. The appellant suggested that respondent's trouble might be caused by a cyst, tumor, or tipped uterus. Respondent began a course of biweekly treatments on February 20, 1940, which continued until March 22, 1940. These were described as being adjustments to the back, electrotherapy administered by a device which used pads placed on respondent's back and abdomen, and treatments with a vibrating device having a belt against which appellant leaned, turning herself so that contact was made around the abdomen and back.

The question of pregnancy was frequently broached by respondent, but appellant, after an examination, assured her that she was not pregnant. No Friedman and Ascheimzondick test (popularly called the "rabbit test") was given. This test was conceded to be from ninety-four to ninety-eight per cent accurate in determining pregnancy. Because there is a challenge to the sufficiency of the evidence interposed in this case by appellant, we now quote a portion of the respondent's testimony:

"Q. Do you recall when you stopped your treatment with Dr. Boulls? A. Well, it was the day that I took so ill. I was down there at the office that morning. And that was the last day. Q. Prior to that time, how many times had you suggested that you thought you were pregnant? A. Oh, a number of times. Pretty nearly every time that I went I'd say, 'Are you sure that I am not pregnant?' And she would say, 'Absolutely not.' Q. Did Dr. Boulls ever have any laboratory tests made? A. No. Q. Or request any? A. No, sir. Q. What happened the last time you went there? A. Well, that was on a Saturday morning that I took sick. I was hemorrhaging so badly and was in such pain. And I went down there and she told me, well, the uterus was tipped badly and it was polyps that was passing and that was good. She said when those would pass away it would be just fine. So she said she would pack the vagina to hold the uterus in position, it would take the pressure, relieve that pain. Q. When did you commence to hemorrhage, how long before that? A. Well, approximately a week. Q. A week? A. Approximately. Q. And what had she done just prior to the commencement or at the time you commenced to hemorrhage? What sort of treatment or examination did she give you? A. Well, I was down there one day and every time I would go I would ask her if she was sure I wasn't pregnant. So she examined me this one day internally, and she took an instrument, a long instrument, and poked up into the uterus and it was very painful, it was awfully painful. And she said—well, she said, 'if you was pregnant the mouth of the uterus wouldn't be open.' And she drew blood. I saw blood on the end of that instrument. Q. That is when you commenced the hemorrhage? A. That was the first that I saw any blood. Q. And you continued hemorrhaging then until you went to the hospital? A. Yes. It kept getting worse all the time from then on. Q. Had she packed your vagina any other time besides that Saturday morning? A. Yes, she packed me that day and said it would hold the uterus in place, that that was what was causing the pain."

On the last day in question in the above testimony, April 6, 1940, respondent had desired to go to Everett with her husband. She was hemorrhaging badly. Appellant had packed her vagina and advised her not to go. She nevertheless started out but turned back after going a few miles and contacted the appellant. Appellant's husband attended

her and advised immediate hospitalization. She was taken to a hospital, and Dr. Pruit performed a "curettment" forthwith, because she was in the process of aborting. Six weeks later, he operated on her and removed both fallopian tubes and a cyst from the right ovary. Medical testimony established that there is danger of producing an abortion if the uterus is invaded during pregnancy.

Appellant assigns as error the court's denial of her motions to dismiss, for judgment n. o. v., and for a new trial. The appellant further contends the court erred in entering judgment on the verdict without reducing the amount of the verdict. Lastly, the appellant contends that the court erred in participating in the examination of witnesses which amounted to a comment on the evidence.

In support of appellant's contention on the question of the sufficiency of the evidence, she claims that respondent's testimony touching the invasion of the uterus was inadmissible (1) because she could not have testimonial knowledge, and (2) because it falls in the field of expert testimony, to which a layman may not testify.

We will assume, without deciding, that this testimony was essential to the respondent's case and that without it the evidence would be insufficient to sustain the verdict. This is for the reason that the other treatments, stoutly maintained as not being contra-indicated in cases of pregnancy, might have left the case in the realm of speculation. However, as to this evidence of invasion of the uterus, the appellant stands on a denial rather than on the proposition that an abortion following an invasion of the uterus would be speculative as to its cause. The invasion of the uterus is based solely on the testimony of the respondent as previously set out.

We quote appellant's first contention.

"Picture the patient lying flat on her back on a table and the doctor working over her. Could the patient see where the instrument was 'poked'? It would be a human impossibility for her to so do unless she was a contortionist. How did she know then, by the sense of feeling? I think not, for it is common knowledge that there are other cavities

and orifices entering into the vaginal canal, such as the uretha, and I do not believe the sense of touch is developed to such an acuteness that the layman could know whether an instrument was inserted up into the uterus or some other opening or cavity within the vagina canal."

No objection was made to the admission of the testimony as quoted earlier in this opinion, but in any event we would not be prepared to say that the respondent lacked testimonial knowledge as to the things testified to.

We quote appellant's second contention:

"Furthermore, the statement of the witness as to where the instrument was 'poked' invades the realm of the expert and is beyond the knowledge of ordinary laymen and for that reason ought to have been stricken as a conclusion of the witness or opinion and with no proper foundation first having been laid."

None of appellant's citations are applicable to the case at bar, and, as before stated, no objection was made to the testimony. In any event, we are not prepared to say that it falls in the realm of things beyond common experience of women in general, or requires special knowledge, skill, or training not possessed by women generally.

■ Appellant contends that the verdict is excessive. From an examination of the record, touching medical and hospital bills, loss of wages, pain and suffering, and impairment to the nervous system, we are not prepared to hold it to be excessive.

■ Lastly, the appellant contends that the court, by examining witnesses, commented on the evidence and that this was reversible error. She contends that, while no objection was made, none should be required because an objection would prejudice the jury.

We quote a fair sample of the court's examination:

"THE COURT: What do you mean? This treatment was not what? THE WITNESS: There is none of it that is contraindicated in pregnancy, none that we wouldn't use in a pregnancy case. THE COURT: Did you use the electrical vibrating belt machine? A. I never use that on a pregnant woman. It wouldn't tend to reason— THE COURT: (Interrupting) Well, I asked you if you used it in this case? THE

WITNESS: No. It would be entirely foolish for me to first go to work and pack her and work to stop the flow and then put on an electric vibrator to start a flow. I would be working against myself. THE COURT: Well, did you diagnose her case as pregnancy? THE WITNESS: I didn't diagnose her case. It yet had not been diagnosed when she quit. She was feeling so much better. She had just been in the office thirty days from the day she started treatment. THE COURT: You had not yet diagnosed her? THE WITNESS: No, I had checked her on the machine and followed up to see whether there was any albumin. She had two checks on that."

We do not agree that appellant can raise the question here when there was no objection in the court below. That the court has wide discretionary powers in the trial of a cause and is not prohibited from questioning a witness, is beyond controversy. Such a course may constitute a comment on the evidence where it is improperly done. To constitute a comment on the evidence, however, it must appear that the attitude of the court toward the merits of the cause must be reasonably inferable from the nature or manner of the questions asked and things said. We think this record does not disclose any grounds for the jury to infer that the court had or expressed any opinion.

The judgment is affirmed.

BEALS, C. J., BLAKE, and ROBINSON, JJ., concur.

SIMPSON, J., concurs in the result.