[No. 36248.   En Banc.   June 6, 1963.]

THE STATE OF WASHINGTON, *Respondent*, v. THELMA ANN SWENSON, *Appellant*.*

* Reported in 382 P. (2d) 614.

*John F. Walthew*, for appellant.

*Charles O. Carroll* and *Frank L. Sullivan*, for respondent.

HALE, J.—Frederick Arthur Ferguson[1] murdered Mary Campbell. He choked her, beat her in the head with an iron pipe, and then shot her through the head with malice aforethought. He said that Thelma Swenson put him up to it. Virginia Ferguson, Arthur's wife, said so too.

Evidence showed that Mary Campbell, mother of six children, was a fine woman, constantly engaged in good work for her church, and was respected and admired by the officials and members of her church organizations. She had befriended Thelma Swenson, employed her as a baby sitter, counseled her in her marital problems, had Thelma and her children in her home for Thanksgiving dinner, and had given her $50 for toys for the children's Christmas. The record shows that Mary Campbell earned nothing but the respect and affection of all who knew her. But for the testimony of Arthur and Virginia Ferguson and perhaps a few rather vague purported admissions reconstructed by police officers, no motive was shown in Thelma Swenson for the killing, no reason for Thelma Swenson to wish Mary Campbell dead.

Since considerable testimony concerned the comings and goings of the principals of the case in connection with their church activities, we find it necessary to point out that all of the principals were members of the Kent Ward of the Church of Jesus Christ of Latter Day Saints. Mary Campbell was a church leader and held numerous posts of importance. Thelma Swenson was also active in the work of the church and attended several meetings of church groups every week. Virginia and Arthur Ferguson likewise were members and

---

[1] Frederick Arthur Ferguson was also known as Arthur Ferguson.

Virginia often attended church-directed meetings during the week. All of this activity among the women required repeated trips to and from their respective homes, telephone calls among themselves, frequent arrangements for baby sitters, transportation, meetings, and all of the other activities so essential to the conduct of an active congregation.

Without the testimony of Arthur Ferguson, who confessed fully, and that of his wife, Virginia, the record of trial shows no motive or purpose in Arthur Ferguson in committing this brutal crime except the motives of burglary and robbery. While he knew Mary Campbell as an active leader in their church, she did not know him. He had no reason to dislike his victim; nothing that Mary Campbell had ever done in the service of her church could be said to have induced in Arthur Ferguson or his wife any feelings of hatred or even ill will toward the deceased. Carve out the testimony of Virginia and Arthur Ferguson—the former of whom we shall later see was implicated to a degree with knowledge of the terrible thing about to happen—and you have the picture of a man of monstrously evil purpose, caught in the commission of a burglary and committing murder to seal the lips of his victim, followed by his flight and numerous steps taken to hide his identity. Believe the testimony of Virginia and Arthur Ferguson and we see the picture of Arthur—docile, dependent and suggestible— driven to murder by the powerful, overwhelming will of Thelma Swenson, for Arthur and Virginia Ferguson both said that Thelma Swenson made known to them, on the night when the murder was first talked over, her love for Curtis Campbell, husband of the murdered woman, and her corresponding dislike of Mary.

In the interests of clarity, we must again point out that, without the testimony of Arthur and Virginia Ferguson, there is virtually no proof of the guilt of Thelma Swenson. Everything else in the case is consistent with her innocence. Believe the evidence of Arthur and Virginia Ferguson, all of the actions of the parties before and after the murder, their comings and goings, and their trips to and from the

church activities and elsewhere, and strong corroboration is found that Thelma Swenson secretly harbored designs of evil purpose toward her friend and benefactor, Mary Campbell. Disbelieve the testimony of Arthur and Virginia Ferguson and all of the corroborating evidence is consistent with attitudes of warmth and friendship and good will between Thelma Swenson and her kindly friend, Mary Campbell.

Arthur Ferguson and Thelma Swenson were both charged with murder in the first degree, Arthur as the actual perpetrator and Thelma as a principal who planned, procured, and commanded him to commit the crime. Ferguson pleaded not guilty by reason of mental irresponsibility, but was found guilty and sentenced to life imprisonment. He does not appeal. Thelma Swenson was convicted of murder in the first degree, sentenced to life imprisonment, and brings this appeal.

Appellant assigns error to several incidents and rulings arising out of and connected with the cross-examination of Virginia Ferguson, and to the admission of evidence in rebuttal concerning her reputation in church. The other assignments of error are not well taken and will not be discussed.

In assessing whether appellant's rights to cross-examination were impaired or infringed, because of the emotional collapse of the witness on several occasions and the consequent interruption of the testimony, together with other occurrences and incidents, we must first consider the importance of the witness within the fabric of the trial itself. For example, one could hardly claim error in unduly restricting or impairing cross-examination where the testimony involved was purely formal or cumulative or related to matters of minor consequence adequately covered elsewhere under the full exercise of the right to cross-examine. Concerning the matters at issue here covered during the cross-examination and to which error is assigned, it should be known that the testimony of Virginia Ferguson and that of her husband were identical with respect to those matters and facts at which both were present. Yet, as to Arthur

Ferguson, the appellant was protected by legal and logical inferences in two regards:

(1) As a confessed murderer, fully admitting a terrible crime, his testimony, insofar as it purported to involve an asserted accomplice, came from a polluted source.

(2) The involvement of an accomplice by him tended to bolster his defense of mental irresponsibility at the murder by showing no motive of gain or revenge or hatred but simply obedience to the will of another.

However, the law afforded no such protection to the appellant from the testimony of Virginia Ferguson, for she (Virginia Ferguson) was never charged with any implication in the crime and, as far as the jury was concerned, voluntarily appeared as a witness on behalf of the state with the consent of her husband to testify, both against him and against appellant.

So that the full effect of the evidence may be understood and to enable an understanding of the issues raised by the claim of error, we feel it necessary to set forth certain parts of the evidence.

Here are excerpts from the confession of Arthur Ferguson which are substantially the same in content as was his oral testimony given at the trial:

" . . .

"I wandered around the lower house and found 2 silver dollars in a blue jewel box in the kitchen powder room. I took off my blue raincoat and laid it on the floor in the bathroom (next to the powder room).

"About 11:30 A.M. I went upstairs and pulled articles of clothing out of the dressers in the bedroom and the hall closet. I went into the study and threw things on the floor from the desk and desk drawers. I also took two boxes of .22 cal. ammunition, one box had nine shells missing. I put them in my pocket.

"Just before I went back upstairs, I put the leather holster in between the crack of the sectional furniture and put the gun in my right hip pocket.

"I went downstairs so I could watch for Mary Campbell when she arrived as I wanted to be in the powder room when she came in.

"I was in the combination bathroom and powder room just off the kitchen when I saw the Campbell's station

wagon drive in. I stood in the powder room and a lady with a baby walked in and past the powder room door into the dining room and laid the baby on the small bed. At this time the pipe was in my right hand and the gun in my right hip pocket.

"She came out and instead of going to the pantry she came towards the powder room door and saw me. She screamed and I grabbed her with my left hand knocking her down and I put one knee on her stomack and one knee across her neck and jaw. She was still screaming so I raised my right arm and hand which held the pipe and told her, 'Just stop screaming'. She nodded her head 'yes' and I helped her up.

"She asked me what I was doing and I told her I needed some money. She said she didn't have much money and went into the dining room where her purse was lying on the table. She took out her wallet and removed three $1. dollar bills and some change. She laid them down on the table. She showed me some credit cards and her driver's license where I saw the name Mary Campbell. I knew for sure now that this was Mary Campbell because I had never seen but a glimpse of her before.

"The baby started to cry and I told her to take care of it. She removed her coat and laid it across the foot of the small bed the baby was lying on. She put on a clean diaper and went to the kitchen and fixed a bottle. I followed her into the kitchen. She went and gave the baby the bottle.

"She then offered to fix me a hamburger or something to eat while we talked this over. I told her that I wasn't hungry. She went to the refrigerator and removed some hamburger which she placed on the kitchen table and unwrapped. She asked if a glass of milk would be OK and I said, 'Yes'. She got two glasses and placed them on the table and got a quart of milk out of the refrigerator. She filled the glasses with milk. She then got a sack of cookies out of the cupboard and put some on a dish and placed them on the table.

"Mary Campbell sat down at the table in the chair nearest the kitchen sink. I put the iron pipe I had in my hand on the chair opposite of Mary. I then sat down on Mary Campbell's left. We started a conversation and she asked why I needed the money. I then began to tell her a false story of why I needed money.

"I then asked her if she would like to see the upstairs which I had torn apart. She told me she would.

"We then went upstairs. She looked in the bedroom and we then went to the master bedroom. Then Mary started to put things back into place and I proceeded to help her do this.

"I then took the gun out of my right hip pocket and said to her, 'I guess I don't need this'. I then put it in the top drawer where I got it from.

"Mary had some papers in her hand which she wanted to burn so I followed her down stairs. We walked into the kitchen. Just to the left of the kitchen door leading from the dining room is a hot air register. She stood on it and leaned against the wall.

"She then said, 'Seeing you haven't done any real damage I won't call the police'. I asked her if she would drive me away from the house in her car. She said, 'No'. I asked her how I could get out of the house without being seen. She walked over to the back kitchen door and I followed. She pointed out the back and I could go through the gate and across the field and cross a little stream on a plank which was across it, then go up through the woods and no one would see me.

"In the corner by the door is a calender with squares and she had activity dates written in. We talked about them for a few moments and I turned to go get my coat and my back was to the kitchen door.

"The next I knew I had my hands around her throat choking her. She stumbled back a couple of steps and slid down the front of the stove and I went down with her. She tugged at my shirt front very lightly, and once at my hair and tugged very lightly at my sleeve.

"I wish to add that when we came downstairs and she stood by the hot air register she reached over and took the pipe of off [*sic*] the chair and laid it on the floor under the table and sat down in the same chair for a few moments.

"My hands were getting tired and her face fell toward the stove. I then reached for the pipe and I hit her across the temple two or three times causing the blood to gush out of her mouth. I then ran upstairs and got the gun out of the dresser top drawer where I had put it and ran back downstairs to the living room. I took a small round red pillow off of the davenport and went into the kitchen where I placed the pillow against her head over her temple. I put the barrel of the gun into the pillow to muffle the sound and pulled the trigger. The gun fired once.

"I ran to her purse on the dining room table, turned it upside down and dumped everything out on the table. I

grabbed the car keys, the 3 one dollar bills and the larger change and put them in my pocket.

"I then ran to the back door and I still had the gun and pipe in my left hand. I remembered I had left my raincoat in the bathroom and went back and got it. I then walked quickly out the back door and to the garage where the Campbell's red and white station wagon was. I laid my raincoat, gun and the pipe on the front seat. I then started the car and backed out of the garage. I drove out of the Campbell's driveway and turned left on S.E. 240th. I drove to the Benson Hiway and turned right. I then turned right off the Benson Hiway on to the Panther Lake Road. I drove out to the area by the Puget Sound Power Bonneville Sub Station. I stopped the car alongside the road and threw the gun and pipe into the woods. I then put on my rain jacket. I drove straight to the Group Health Clinic parking lot and parked the Campbell car in the back corner of the lot. I walked around the block, took the gloves off and put them in my pocket. As I got in my car I saw a parking ticket under my windshield wiper. I took it off and placed it on the seat beside me."

How does the foregoing recital involve appellant? Here is what Arthur Ferguson says induced him to do this evil thing. We again quote from the confession of Arthur Ferguson, pointing out that this evidence was corroborated by him in his oral testimony:

" . . .

"Late Thursday nite she [Thelma Swenson] returned back home. At this time she asked my wife and I if we knew how to get rid of a person and not get caught. I told her if you knew the person's habits real well and planned it very carefully, it could be done. She told my wife, Virginia, and I that she had a gun that Curtis Campbell lent her for protection and it was a .22 cal. Thelma asked me if you could kill a person with a gun like that if they were standing across the room. I told her, if you were a good enough shot and hit the person in the chest you could kill them. Thelma then asked me about shooting them in the head. I told her the bullet could possibly follow the bone around the head under the skin and not kill the person. Thelma said she thought the head was still the best place to shoot a person. Later in our conversation it came out that Thelma had someone in mind to get rid of. After some

prying by my wife and I she said the person was Mary Campbell.

"   .   .   .

"It was then arranged that the next nite, Friday, that she, Thelma, would forget some important papers needed at a meeting which Mary would be at, and Thelma, being the secretary, could get Mary to come to Thelma's house for them. When Mary got to Thelma's I was to be in the bushes and hit Mary in the head with a pipe.

"We talked for quite awhile longer and several times during the conversation she would say, 'You will do it, won't you Art, and not get scared and back out'? She kept harping on this several times.

"Thelma said that she would pick Virginia and I up the next morning (Friday) about 9:30 A.M. and we could ride around until 11:00 A.M. and find a place to leave Mary's body. We then left and drove home. This was around 2:00 A.M. in the morning. I forgot to mention that while we were at Thelma's she told my wife, Virginia, that if she 'squealed' about any of this, 'if Art doesn't kill you I will.'

"On Friday, March 3, 1961, Thelma came to our home about 9:10 A.M. and we were still in bed. We got up and got dressed and left with Thelma about 9:30 A.M. We drove around about 1½ hours but could not find a good spot to leave Mary's body.

"We arrived at Thelma's place about 11:30 A.M.

"All the time we were riding around Thelma kept saying, many times, 'You will do it, Art, you're not going to back out now?'

"We left Thelma's house to go to the I.G.A. Foodliner at the East Hill Shopping Center. It had been agreed that Thelma would buy the gloves. Virginia, Thelma, myself and Thelma's two children were in the car and we left Thelma's about 2:15 P.M.

"When we arrived at the store, Thelma went to the back of the store to buy the gloves and my wife and I bought some things to eat. It had been agreed that Thelma would get the gloves to fit her hands so they would be tight on mine. I can't work with loose gloves.

"My wife and I left the store ahead of Thelma and got in the car. I then saw Thelma in the phone booth making a call. She came out of the phone booth shortly and started toward the car. About half way to the car Thelma looked in her purse, at this time I looked away. Thelma didn't come to the car so I looked to see where she was and she was in the phone booth again.

"When she got back to the car she said that she called a woman to tell her of the meeting that nite, but the lady had told her the meeting was off. She said she also called Mary to see what she wanted Thursday when she came by while she was gone.

"Thelma then said we will have to plan for another time.

"When we arrived at Thelma's house she took the gloves out of the bag and held them up and said, 'We'll save these for another time'."

In view of the limited effect the evidence of Arthur Ferguson might be said to have on the jury insofar as involving Thelma Swenson is concerned, coming as it did from such a vile source and in support of his plea of temporary mental irresponsibility, it is quite apparent how powerful an ingredient is the evidence given by his wife, Virginia Ferguson. Even if the testimony of Arthur Ferguson is treated as emanating from a diseased and depraved mind, the testimony of Virginia Ferguson in connection with proof of other corroborating evidence is sufficient to sustain the verdict, and appellant does not assert insufficiency of evidence as a grounds for reversal.

Both Virginia and Arthur Ferguson testified in accordance with Arthur Ferguson's written confession except that numerous important details not mentioned in the confession were supplied at trial. For example, Virginia Ferguson testified on cross-examination that she contributed three proposed methods of murder, i.e., strangulation, poison and running over the victim by means of an automobile. She said at the trial that these were only half-seriously presented, and that she did not, at the time, really believe that a murder was contemplated. She testified, however, that, in the course of the conversation about murder, she had her husband demonstrate the method of strangulation by means of an electric cord on her, and that he got the device so tightly around her neck that it hurt her. She also stated that, during the long conversation as to the methods one might employ in committing murder, she owned a pair of nylon stockings that would make a good device for committing a murder by strangulation. She admitted her pres-

ence during the entire conversation alluded to in Arthur Ferguson's confession; she admitted she was present during a long automobile ride the next morning when the three of them were searching for a place to hide Mary Campbell's body and on the trip to an I.G.A. food store for the purpose of purchasing gloves to be used in the slaying.

Other aspects of Virginia Ferguson's testimony on direct examination may be summarized as follows:

She became acquainted with Thelma Swenson through church activities, the two women meeting frequently at assemblies of the church school where she, Virginia Ferguson, would teach gospel lessons to young children; they visited in each other's homes where they engaged in joint activities such as cooking, sewing and baking. Arthur Ferguson first met Thelma Swenson in February, 1961, when he took his wife, Virginia, to Thelma Swenson's home for a sewing demonstration. Virginia Ferguson had only a casual acquaintance with Mary Campbell personally, but knew of Mary Campbell's broad activities in the service of the church.

To continue our summary of Virginia Ferguson's direct examination, on Thursday, during the first week in March, 1961, Arthur and Virginia Ferguson went to Thelma Swenson's home to act as baby sitters. Thelma Swenson returned to the home around 11 o'clock at night when her children were then put to bed. Thelma Swenson asked Arthur and Virginia Ferguson if they knew how to get rid of a person without getting caught. In the conversation they had prompted by this inquiry, Virginia Ferguson mentioned poison as one method and Thelma suggested beating. Arthur Ferguson said that shooting from a distance might be all right if you hit the victim just right. Many methods of murder were described by these three individuals as they talked the subject over until nearly 3 in the morning, a period of nearly 4 hours. Arthur and Virginia Ferguson left Thelma Swenson's house in the early morning, but just before leaving, they learned the identity of the intended victim whose portended murder they had been discussing for some 4 hours. The very last item of conversation between the three

of them was the death of Mary Campbell and, at that time, they reached an agreement to drive about the county the next morning to seek a place to hide the body of Mary Campbell.

Further, on direct examination, Virginia Ferguson testified:

The next morning, Thelma Swenson and Virginia and Arthur Ferguson drove about in Thelma Swenson's automobile into unpopulated areas in King County for about 2 hours, looking for a place to dispose of Mary Campbell's body. They then went to the I.G.A. store in Kent where Thelma bought some gloves to be worn by Arthur Ferguson in the commission of the crime. On the morning of the murder, Thelma Swenson picked up Virginia Ferguson and some other women and drove them to the church for a meeting of the relief society and to hold singing practice. Mary Campbell was at this church meeting and left at about 11:30 in the morning to her rendezvous with death. Earlier, she had arranged with Thelma Swenson that she (Thelma Swenson) would look after one of the Campbell children; so, shortly after Mary Campbell's departure, Thelma Swenson took Virginia Ferguson, the little Campbell boy and two other children from the meeting in her car. After discharging some of her passengers, she returned to her home with Virginia Ferguson, her own son and the Campbell's little boy. When Mary Campbell arrived at her own home, Arthur Ferguson killed her.

Virginia Ferguson testified that, after she got to Thelma Swenson's home on the fateful morning, Thelma Swenson acknowledged her participation in the crime. Here is an excerpt from Virginia Ferguson's testimony on this point:

". . . and she [Thelma Swenson] says, 'You are going to hate me,' and I says 'Why?' And she says 'Art was here last night and he was here Monday,' and she says, 'There wasn't nothing to it.' She says, 'He was here and we was discussing his problems and talking about you, and talking about him getting a job,' and she told me that she had spoken to Mr. Campbell and that Mr. Campbell was going to try to get Art on at Boeing's. She kept talking about different things like this about Art and me, and then finally

she says, 'I know where Art is right now.' I looked at her and I says, 'Where is he?' And she was silent for a minute and all this time she kept her hands on my waist and was swinging back and forth and she says, 'Art's up there right now butchering her.' And I says, 'You mean Mary?' And she says, 'Yes, Mary Campbell.' "

From this brief synopsis of but a small portion of Virginia Ferguson's testimony, it is readily understood that her evidence was of the utmost importance. Considered in the light of the law that Arthur Ferguson's evidence would be deemed as emanating from a corrupt, if not delusional, source, and from the viewpoint that all of this other evidence, if considered apart from that of the Fergusons', was as consistent with appellant's innocence as with guilt, and, further, taking into consideration that no motive whatever on appellant's part was shown if the Fergusons' evidence was disbelieved, we can understand that the testimony of Virginia Ferguson was the keystone in the structure of the state's case against Thelma Swenson. Consideration of the issues in this appeal then must be made in the light of the devastating nature of the testimony in connection with several occurrences and incidents which developed during the cross-examination of Virginia Ferguson.

Although we are reluctant to extend this opinion, we feel obliged to set forth those parts of the record which recite the occurrences and incidents upon which a new trial is sought. At the time of her testimony, Virginia Ferguson was noticeably pregnant, which, as we shall see, provided an additional factor affecting her testimony.

Appellant urges that the incidents and occurrences during the cross-examination placed her at a serious disadvantage in four respects: (1) Emotional and physical collapses of the witness inevitably aroused undue sympathy for the witness; (2) obvious pregnancy and emotional strain inspired animosity against appellant; (3) the court's remarks concerning emotional and physical health gave unwarranted weight to her testimony; and (4) appellant's cross-examination was impaired by interruptions and subjected appellant to the risk of arousing the ill will of the jury by her free exercise of the right to cross-examine.

Cross-examination of Virginia Ferguson started at about 3:17 Thursday afternoon, July 20th. At a point in this cross-examination, she testified that, during a long conversation on the subject, she herself had suggested poison as a method of killing. She had been on the witness stand about an hour, when, at approximately 4:15, the following incident occurred:

"THE COURT: Mr. Walthew, may I interrupt your examination for just a moment? Ladies and Gentlemen, we will take a breather for a few minutes. You are at liberty to stand and stretch if you want to. MR. SAVAGE: Could we approach the bench? THE COURT: Surely. (There was side bar conversation between Court and Counsel.) THE COURT: Mrs. Ferguson, will you come back to the stand? Do you feel able to go ahead, Mrs. Ferguson? THE WITNESS: I just got slight pains in my stomach. THE COURT: Would you rather take a little longer recess? THE WITNESS: It's all right. THE COURT: All right. Now if you don't feel well, you let me know. All right. You may proceed."

Following this incident, a more detailed picture of which is lacking, Virginia Ferguson proceeded on cross-examination to describe how she had volunteered the information that she had a pair of nylon stockings that could be used for purposes of strangulation. Virginia Ferguson had already suggested poison as a method and brought up the idea of the nylon stockings before she knew the identity of the intended victim.

Cross-examination continued for about 20 minutes when it was interrupted at about 4:35 by the following:

"THE COURT: Would you like to have a short recess? Ladies and Gentlemen, we will recess until 9:30 tomorrow morning at this time."

It is clear that this second interruption was occasioned by some picture of physical or emotional distress on the part of Virginia Ferguson. Court was thereupon recessed until 9 the following morning, Friday, July 21st, when cross-examination resumed.

The cross-examination commenced at 9 and had proceeded to a point where Virginia Ferguson had suggested

a third form of murder to Thelma Swenson, by means of a motor vehicle, in the following language:

"Well, I told Thelma that—this was before we found out who it was—I told her that, and it was after she told me it was a woman, later that night when she told me it was a woman, and I told her, 'Well, if you have seen her downtown and she went to cross the street, why don't you run over her?' . . ."

The cross-examination had scarcely passed this point and the witness was describing the purchase at the I.G.A. store of a pair of gloves to be worn by her husband in killing Mary Campbell when another incident occurred at about 10 o'clock:

"The Witness: Your Honor—The Court: Would you like a little recess? The Witness: I would like a drink of water. The Court: We will just be at ease for a minute, Ladies and Gentlemen. The Court: Do you feel able to go ahead? The Witness: Yes."

About 6 minutes later, when the subject under examination was still the purchase of the murder gloves at the I.G.A. store, the next incident arising during the cross-examination of Virginia Ferguson took place:

"The Court: Would you like to have a short recess? The Witness: I am all right. The Court: Ladies and Gentlemen, we will take our morning recess at this time. You may retire to the jury room for fifteen minutes."

At this point, in the absence of the jury, appellant, through her counsel, pointed out to the court that Virginia Ferguson had not collapsed while giving some 3 hours of testimony on her direct examination when called as a witness by the respondent. The jury was kept at recess from 10:06 until 10:35, a period longer than usual, and, upon their return to the jury box, the court told them:

"The Court: Ladies and Gentlemen, Mrs. Ferguson's condition does not permit her to return to the stand at this time. I hope that she will be able before long to be back for the completion of her cross-examination. I have directed that her cross-examination be interrupted and I have asked the State to call their next witness."

Thus, the jury last saw the witness undergoing vigorous examination and next heard that she was physically and emotionally unable to continue. Virginia Ferguson's cross-examination was thereupon interrupted and other witnesses were called by the state.

At 2:10 p.m., the court summoned the jury from recess and instructed them as follows:

"THE COURT: You may be seated. Ladies and gentlemen, Mrs. Ferguson, as I explained—I am not sure whether I did explain it to your or not—is not going to be able to return this afternoon. She was examined at Harborview Hospital this morning and while there is nothing seriously wrong the doctors recommend that she not try to return to court this afternoon. Accordingly, I have excused her until 9 o'clock tomorrow morning. With the exception of the completion of her cross examination the State has now completed its case."

Court was then recessed at 2:12 in the afternoon until 9 the next morning when the cross-examination of Virginia Ferguson was resumed. We believe the jury could not help but have felt that Virginia Ferguson's emotional condition was quite serious, in view of the premature recess during the trial, for court sessions had been held at night, and the court had ordered a session for Saturday.

Virginia Ferguson had been on the witness stand about one-half hour and the subject under cross-examination was whether the witness had told a psychiatrist that the appellant had suggested the methods of murder, when the following interruption took place:

"THE COURT: Pardon me just a minute. Would you like a few minutes recess? THE WITNESS: No, it's all right. I just want to rest for a minute. MR. WALTHEW: I am perfectly willing—I would prefer to suspend for a short time. I would much prefer to. THE COURT: We will be at ease for a minute. MR. WALTHEW: Might I be excused? THE COURT: Yes, you may be excused. Would you like to step down for a minute, Mrs. Ferguson? You may if you wish. (Thereupon, at 9:33 o'clock a.m., court was at ease for approximately one minute.) THE WITNESS: I am all right now. THE COURT: All right. You may resume."

The next incident involved Ersel Pierce and Mrs. Ida Ferguson. Ersel Pierce was a 15-year-old boy and brother of witness Virginia Ferguson. Mrs. Ida Ferguson was mother of the defendant, Arthur Ferguson. Both were seated at or near the front row of the spectators' benches. The interruption occurred about 12 minutes after the preceding interruption during a time when Virginia Ferguson, in her cross-examination, was decribing how her husband, on the Friday preceding the murder, demonstrated upon her how strangulation could be accomplished with an electric extension cord. The following occurrence took place at 9:45 a.m.:

"THE COURT: Would you like a few minutes' recess? THE WITNESS: I'll be all right. THE COURT: We will just be at ease for a minute. MRS. IDA FERGUSON: Why don't you leave her alone? MR. WALTHEW: Your Honor please, I ask for a mistrial of this case in view of that last demonstration. ERSEL PIERCE: She's going to kill us all. MR. WALTHEW: There is a murderer in this case. ERSEL PIERCE: I hate you. THE COURT: The jury will please retire to the jury room."

The jury was recessed accordingly at 9:45 in the morning. Appellant, through counsel, made a motion for a mistrial which was denied. Following the incident described and during the colloquy between court and counsel, the jury was at recess and reconvened at 10:20. Immediately upon their being seated, the trial court stated:

"THE COURT: You may be seated. Ladies and Gentlemen, it will be a little time before Mrs. Ferguson is able to continue. In the meantime, and to save time, I am going to have played to you the tape recordings that have been referred to earlier here. . . ."

Thus, as far as the jury was concerned, Virginia Ferguson was physically and emotionally unable to resume cross-examination despite a lengthy recess. Virginia Ferguson was off of the witness stand during the brief testimony of a police officer and the playing of some tape recordings until 11:18 in the morning when, upon being recalled, the following colloquy was had:

"THE COURT: Do you feel well enough to go ahead? THE WITNESS: Yes, I do. THE COURT: You may proceed, now.

Mrs. Ferguson feels able to continue so that we will go back to her cross-examination."

The cross-examination of Virginia Ferguson then proceeded, followed by the playing of some tape recordings. At about 12:28, in the early afternoon, just prior to declaring the noon recess, the court admonished the jury that, if during the morning they had heard any statements by spectators or people in the audience, they should completely disregard the same. The admonition was clearly and forcibly put, but came nearly 3 hours following the interruptions and remarks made by Ersel Pierce and Ida Ferguson.

Four queries emanating from the ideals of substantive due process derive from the foregoing recital:

(1) Did the emotional collapses of the witness embarrass the right of cross-examination?

(2) Did the court's demonstrated concern for the witness's health and well-being add weight to the state's evidence?

(3) Do a series of incidents, untoward and even unpreventable, none of which standing alone would be reversible error, but which, considered as a whole, might well affect the atmosphere of the trial unfairly, warrant a new trial?

(4) Has a court of review power to assess the probable effect of a series of untoward incidents where their nature and the circumstances thereof can be summarized only from the bare words of courtroom colloquy?

■ The case presents a unique problem, however the occurrences may be labeled, whether as irregularities, untoward incidents, or misconduct of witnesses, bystanders or counsel. We are compelled by the very force of circumstances here to assess the total effect of the incidents, any one of which standing alone and considered separately would probably be insufficient in magnitude to constitute an abuse of discretion by the trial court in refusing to declare a mistrial or, finally, in declining to grant a new trial. That the trial court has wide discretionary powers in governing the trial of a cause is, of course, readily recognized by our cases. *Ramsey v. Mading*, 36 Wn. (2d) 303, 217 P. (2d) 1041; *Dennis v. McArthur*, 23 Wn. (2d) 33, 158 P. (2d) 644;

and *Dunlap v. Seattle Nat. Bank*, 93 Wash. 568, 161 Pac. 364. But none of the cases cited by the state, other than declaring the broad general rule, approached the necessities of the case at bar. *Ramsey v. Mading, supra*, simply held that the court had discretionary powers to appoint a disinterested appraiser to view certain premises and report his opinion into court in lieu of the court's own inspection of the premises. Likewise, in *Dennis v. McArthur, supra*, error was assigned to the questioning of a witness by the trial court. We upheld the power of the court to examine the witness on his own motion as being beyond controversy. In *Dunlap v. Seattle Nat. Bank, supra*, the court exercised its discretion by allowing one of the parties to reopen his case during final argument. In none of the foregoing cited cases, all of which were relied upon by the respondent, can we find authority for such sweeping discretionary powers asserted to be vested in the trial court as to place the facts of the case at bar beyond the powers of review.

The trial court must have power to deal with irregularities, outbursts and untoward incidents occurring within or without the courtroom during the trial of a criminal case. This rule is essential to the very maintenance of our judicial system, and we have, in effect, said this in *Smyser v. Smyser*, 19 Wn. (2d) 42, 140 P. (2d) 959; *Turner v. Wenatchee Vinegar Co.*, 162 Wash. 313, 298 Pac. 683; and *Kayser v. Foster*, 138 Wash. 484, 244 Pac. 708. But this court cannot ignore that the quantum of irregularities must be considered on review. Attention must be given to the accused's predicament where, caught in the web of circumstances at the trial over which neither court nor counsel has control or power to alter, he seeks a forum free from emotion and prejudice. It is told over and over in the books that the law and the courts are powerless to make correction unless the circumstances of abuse of discretion are apparent, item by item, to the reviewing tribunal. What then becomes of substantive due process? How weigh the scales to measure the error, item by item, or in the sum?

The oft-repeated declaration of the rules reserving to

the trial court broad discretionary powers to conduct a trial, preserve order and govern the order of proof, ought not be used as a refuge wherein courts of review hide from the exigencies of due process. The mere utterance of this rule of broad discretion without critical examination of the circumstances which invoke it will tend in time to erode the fundamentals of due process prescribed by the bill of rights.

The total of all events as revealed in the record of trial here—irregular in nature, prejudicial in character—together with the very force of circumstances arising from the obvious pregnancy and the emotional collapses of this vital and telling witness on cross-examination, makes mandatory an evaluation of the effect of the same. In addition to the possibilities of sympathy on the one hand and a corresponding prejudice on the other, we have the likelihood of a marked impairment of the right to cross-examine. Though in its rulings the court did not in any way curtail or hinder appellant's right to cross-examine and allowed wide latitude and abundant time, the physical and emotional condition of this crucial witness compelled appellant to proceed with extreme caution. Appellant was obliged to exercise restraint not necessarily because the answers on cross-examination might prove damaging or even emphasize the telling evidence given on direct—these are the expected and normal risks—but she was forced to circumscribe her cross-examination for fear of being held blameworthy by the jury in goading a pregnant woman, who had demonstrated on cross-examination her inability emotionally and physically to undergo the very type of searching cross-examination that the situation demanded.

The right to cross-examine in a criminal case is basic and is zealously guarded by the courts. This is shown in *Alford v. United States*, 282 U. S. 687, 75 L. Ed. 624, 51 S. Ct. 218, a prosecution for mail fraud. Having testified on behalf of the government, a witness was first asked on cross-examination where he lived. Objection was urged on the ground that this was immaterial, and the objection was sustained by the trial judge. In arguing the point, counsel

for the defendant indicated that they were advised the witness was, at the time, being detained by the federal authorities. The court again ruled that the evidence of his place of residence was immaterial and that mere custody could not be shown to affect the credibility of the witness —this rule being limited to a showing of a conviction for felonies—and sustained the objection to the question but allowed wide latitude on cross-examination to all other phases of the direct examination. In ordering a reversal and a new trial on this quite narrow impairment to the right of cross-examination, the supreme court said:

"Cross-examination of a witness is a matter of right. . . .

"Counsel often cannot know in advance what pertinent facts may be elicited on cross-examination. For that reason it is necessarily exploratory . . . It is the essence of a fair trial that reasonable latitude be given the cross-examiner, even though he is unable to state to the court what facts a reasonable cross-examination might develop. . . ." *Alford v. United States, supra.*

Where the supreme court held it error in the refusal of the trial court to allow what seems to us to be a rather minor question, the far greater degree of impairment of the right to cross-examine is quite obvious in the case at bar. We think all of the circumstances and incidents of the trial combined to materially embarrass the appellant in the exercise of her right to cross-examine.

Many cases may be cited to qualify the well-established rule that the court has broad discretionary powers to take remedial action in neutralizing the effect of incidents and irregularities at trial and the court's decisions in this respect will be upheld unless abuse of such discretion is clearly shown. It was held that a new trial be granted in *Illinois Central R. Co. v. Rothschild,* 134 Ill. App. 504, where the plaintiff fainted at the end of her testimony and an exciting scene developed as her rescuers came to her aid. Fainting and weeping and an exclamation that the "Lord have mercy on us." warranted a new trial in *Collum v. State,* 21 Ala. App. 220, 107 So. 35. A denial of a mistrial was reversed and a new trial ordered in *Ullom v. Griffith,*

263 S. W. 876 (Mo. App.) where a witness commenced weeping on cross-examination in a civil case and a juror showed a critical attitude toward examining counsel, but, nevertheless, promised to be fair and impartial and to base his judgment solely upon the evidence. Likewise, it was held to be serious error in *Henderson v. Union Pac. R. Co.*, 189 Ore. 145, 219 P. (2d) 170, when counsel, in closing argument, referred to jurors by name and called to their attention that the defendant had exercised certain peremptory challenges. Again, in *State v. Gevrez*, 61 Ariz. 296, 148 P. (2d) 829, a first-degree murder trial, two incidents were considered to have deprived the defendant of a fair and impartial trial where proof of guilt was otherwise very strong. During the opening statement, the mother of the deceased victim arose and shouted in the immediate presence of the jury, "Stop it! Stop it! She's not here, she's dead!", and wept bitterly. Later in the case, the daughter of the deceased victim came upon the witness stand carrying a doll. She was asked by the prosecuting attorney if it was a new doll, and the fifth-grade child answered, "It was my mama's doll." The combination of these two incidents was held to constitute prejudicial and reversible error.

In *White v. State*, 25 Ala. App. 323, 146 So. 85, it was found that the exclamations made during final argument by the deceased's widow constituted such prejudicial misconduct that nothing the trial court could have said or done would have remedied the harm done to the defendant.

Through the centuries, it has been the goal of the courts, law teachers and lawyers to create and maintain forums where only the truth will emerge. That this goal from time to time has not been reached goes without saying. Being institutions created by and conducted by people, the courts are subject to the same imperfections which people are heir to. Final achievement of this goal and fulfillment of these aspirations could be reached only under what might be called laboratory conditions where the courtrooms are as free from extraneous influences as the surgery of a modern hospital is free from contamination. Because witnesses, jurors, lawyers and even judges bring with them into the

courtroom all of the physical, emotional and intellectual qualities—differing one from the other in a thousand ways —which go to make up the total human personality, it is likely that reactions to the same situations will vary in different individuals. Thus, that which excites sympathy or arouses prejudice in one juror would possibly be shrugged off phlegmatically by another. Where one juror might see a simple routine statement of explanation in the court's references to the witness's physical condition, another would treat the same statements as expressions of sympathy toward the witness in her ordeal and transform these sentiments against the defendant. The same analysis could be made of all of the interruptions and emotional collapses engendered by the cross-examination. While so-called laboratory conditions can never be realized, it is, nevertheless, the burden of the courts to strive for them and to try all cases in an atmosphere of complete impartiality, not only without any reservation whatever but devoid of appearance of any such reservation. If the trial has been shorn of any of the ingredients from which substantive due process is made, it is of small moment that the mechanism which does this falls within the recognized classifications of judicial error, or, on the contrary, arises from a combination of circumstances and events either partially or wholly beyond the court's control. In either case, the decision must be the same. Any rule to the contrary will sacrifice our bill of rights and our concepts of substantive due process upon the altar of expediency.

It is our view, then, that the events occurring during the cross-examination of Virginia Ferguson, coming as they did against the backdrop of her vital importance as a witness against appellant, considered in their entirety, combine to deprive the appellant of those essentials of substantive due process which are requisite under our system.

One other assignment of error warrants our attention. It concerns evidence given in rebuttal by the state as to appellant's reputation for truthfulness.

Questions put to the witnesses asked for knowledge of appellant's reputation in her church or with church people,

instead of calling for knowledge of her reputation for veracity in the community where she resided. Witness Raymond Reiter was first asked if he held any position in the Mormon Church, and he answered that he was first assistant to the Bishop. He was then asked if he was familiar with Thelma Ann Swenson's reputation for truthfulness within the church group of Kent. The witness expressed doubt as to his knowledge of reputation apart from his personal opinion as to appellant's truthfulness. The same question as to the witness's knowledge of her veracity among members of her church was put to this witness five times before the subject was dropped unanswered. The question went unanswered when the witness volunteered that his knowledge of her reputation for truthfulness was hearsay.

Another witness, Grace Wilton, likewise called on rebuttal, answered affirmatively that she belonged to the Mormon Church in the Kent Ward, and that as a church member in that ward she was familiar with Thelma Ann Swenson's reputation for truthfulness among the church people. The witness then stated that appellant's reputation in this regard was very bad. In response to a direct query, the witness declared that she would not believe appellant under oath.

A third witness, Mrs. Reid Olson, wife of the Bishop of the Kent Ward, was called on rebuttal for the sole purpose of establishing appellant's bad reputation for veracity. The witness was asked directly if she was familiar with the reputation of Thelma Ann Swenson for truthfulness among church members, and she replied that appellant's reputation was bad. She was asked directly whether she would believe the appellant under oath, and she stated that she would not.

█ Two errors are apparent in the foregoing testimony as to reputation. Reputation of a witness for truthfulness and veracity among people of her church, or in the church, was improper, and the evidence constituted a breach of the rather strict rules governing character evidence in this jurisdiction. The evidence should have been limited to proof of appellant's general reputation for truth and verac-

ity in the community in which she resided. *State v. Fiddler*, 57 Wn. (2d) 815, 360 P. (2d) 155; *State v. Ternan*, 32 Wn. (2d) 584, 203 P. (2d) 342; *State v. Riggs*, 32 Wn. (2d) 281, 201 P. (2d) 219.

█ Secondly, the questions put to the witnesses called for the personal expression of opinion as to whether the witnesses would believe the appellant under oath. This was error. To bluntly ask a witness if he would believe another under oath is both argumentative and calls for a conclusion. It also asks for the expression of a personal opinion in a sphere outside the area reserved for the taking of expert testimony. This court undertook an extensive analysis of the question in *State v. Hooker*, 99 Wash. 661, 170 Pac. 374. There a witness testified that he knew the reputation of the other witness for truth and veracity in the community in which he lived, and that it was bad. The further question, "From your knowledge of that reputation, would you believe him on oath?" was allowed, but the reasons supporting the allowance of this question—qualified as it was and dependent upon knowledge of reputation in the community—left the question open to future analysis. We need enter in to no further discussion now for the question put to the witness at bar called for a personal opinion, neither conditioned by nor dependent upon knowledge of reputation in the community.

Reversed and a new trial ordered.

ALL CONCUR.