[No. 31177.   Department Two.   May 4, 1950.]

HARDY M. RAMSEY *et al., Appellants,* v. W. C. MADING *et al., Respondents.*[1]

[1]Reported in 217 P. (2d) 1041.

*Guy E. Dunning* and *Carl F. Christophersen,* for appellants.

*Wettrick, Flood & O'Brien,* for respondents.

HAMLEY, J.—Plaintiffs, as vendees of certain residential property in Seattle, brought this action for rescission of the executed contract of sale. They alleged that, after taking possession of the premises, the house was found to be in a dilapidated condition. They asserted, as a basis for rescission, that they were the victims of fraud and duress, and that the vendors took an unconscionable advantage of plaintiffs' disabilities and lack of experience. These allegations were denied by defendants. After a trial to the court, a judgment was entered dismissing the action. Plaintiffs have appealed.

The sale and purchase in question was preceded by several real-estate transactions to which reference must first be made. All of these transactions, including the one here in question, took place in the fall of 1947. At that time, appellant Hardy M. Ramsey, was seventy-three years of age and in poor health. His wife, appellant Sadie J. Ramsey, was ninety-three years of age and somewhat hard of hearing. Neither of appellants had had any schooling. Their general business experience was apparently very meager. There was testimony, however, that they had bought, im-

proved, and sold at a profit, at least three pieces of real estate in the preceding four years.

In September, 1947, appellants were negotiating for the sale of their home, located at 428 Thirtieth north, in Seattle. This sale was being handled for them by Geneva B. Miller, a real-estate broker. As this sale would necessitate appellants finding another place to live, Mrs. Ramsey went to respondent W. C. Mading, who is also a real-estate broker, in search of a house appellants could buy. Mr. Mading has had about thirty years experience in the real-estate business. Mrs. Mading is also a defendant and respondent in this suit, but the term respondent, as used herein, will refer only to Mr. Mading. This first meeting between Mrs. Ramsey and respondent took place about October 1, 1947.

Respondent first showed appellants a house in the Ballard district of Seattle. Appellants agreed to buy this place and paid respondent one hundred dollars as earnest money. About four days later, Mrs. Ramsey advised respondent that appellants had decided not to purchase this house because of the time it would require to clean it up fit for occupancy. Appellants requested respondent to show them another house. He then showed them a house on Beacon Hill, in Seattle. They were satisfied with this place and returned to respondent's office to complete the transaction.

By this time appellants had sold their home at 428 Thirtieth north to Mr. and Mrs. Singletary. This contract stipulated a total purchase price of $4,250, with a one-thousand-dollar down payment and the balance payable at fifty dollars a month with interest at five per cent. As consideration for the purchase of the Beacon Hill property, appellants agreed to assign to the owner of that property appellants' interest in the Singletary contract. They also agreed to authorize Geneva Miller to deliver to respondent, as agent, the $757.75 net proceeds of the down payment on that sale. This was done, and respondent came into possession of this sum on October 16, 1947.

On October 20, 1947, appellants moved into the Beacon Hill house. Shortly afterward it was found that the roof

leaked badly. Respondent arranged with the owner to have a new roof put on part of the house, but appellants were still not satisfied. Mrs. Ramsey testified that she went to respondent several times to get him to find them another place or give them their money back, but that he refused. Respondent denied that Mrs. Ramsey ever demanded her money back on the Beacon Hill sale.

Mrs. Ramsey then went to attorney James A. Dougan, a director of the legal aid bureau in Seattle. As attorney for appellants, Dougan wrote to respondent, calling attention to the defective condition of the Beacon Hill house and the fact that title insurance had not been supplied within thirty days as required by the earnest-money receipt. He demanded that the sale be rescinded and that appellants' money be returned to them.

Respondent then met with appellants in Dougan's office, prepared to return the $857.75 (which amount included the one-hundred-dollar earnest-money payment on the Ballard transaction) then in his possession, less fifty dollars which had been retained by the owner of the Ballard house. Before the money was returned, Mrs. Ramsey stated that she had seen respondent's advertisement of another house for sale, and said she would like to see it. Respondent at first declined to deal further with appellants, but finally agreed to show them this third house. While respondent had dealt as agent in connection with the Ballard and Beacon Hill properties, he was the owner of this third place, which was located at 2606 East Thomas street, in Seattle. This fact was known to appellants and Dougan. Without stopping to complete the rescission of the Beacon Hill sale, Mrs. Ramsey and respondent went out to inspect the Thomas street property. It was Mrs. Ramsey's testimony, denied by respondent, that before viewing the house, respondent told her that it was a good house, with a good floor and good roof, and that everything was in "apple pie" order.

The Thomas street place was then occupied by a Mr. and Mrs. Bowden under a contract to purchase the property from respondent. The Bowdens had found themselves unable to

pay more than twenty-five dollars a month on this contract, and for this reason respondent was looking for another purchaser. Mrs. Bowden testified that, when respondent brought Mrs. Ramsey to see the house, he told the witness not to say anything to Mrs. Ramsey, as the latter was apparently willing to take the place almost sight unseen. Respondent denied this. Mrs. Ramsey stated that her view of the premises was very hurried, lasting only ten minutes. Respondent testified that Mrs. Ramsey was in the house for about a half hour and was free to see everything she cared to. The testimony is in conflict as to whether Mr. Ramsey was present on this inspection trip, appellants' testimony being that he did not see the premises until just before appellants moved in.

Mrs. Ramsey testified that, during her inspection, she noted that the hardwood floors were warped and "just like a washboard," and had apparently been that way for "years and years." She stated that she did not look at the house from the outside before moving in, but that, as they came up on the porch, respondent stated that the porch needed some repairing. Mrs. Ramsey testified that the following conversation took place:

"I says, 'It looks to me like it needs it [repairing] all over. If you will give me my money back I'll get another place. I don't think this is a good place at all.' . . . And he said, 'Take this or nothing. I can't give you no money back. That is the way I make my living, is to keep my money when I get it.' "

As before indicated, respondent denied that he ever refused to return appellants' money, and testified that he had gone to Mr. Dougan's office for that express purpose. Respondent stated that he called Mrs. Ramsey's attention to the fact that a corner of the house had settled and testified that this would be evident to anyone. Respondent said that he took Mr. Ramsey down underneath the house and showed him the underpinning, and called attention to the fact that there was no gutter on one side. Respondent said that, when Mr. Ramsey indicated that he could take care of the place

where the house had settled, respondent offered to loan him some jacks for that purpose. Mr. Ramsey denied this.

The parties then returned to Mr. Dougan's office, where an agreement was executed effectuating the rescission of the Beacon Hill sale, and providing for the sale and purchase of the Thomas street property. Mr. Dougan testified that he did not draw this agreement until both Mr. and Mrs. Ramsey said that this was the house they wanted and that they were satisfied. This contract was signed on November 13, 1947. It does not recite a specific purchase price, but provides that, as full consideration for the sale, respondent would retain $737.75 of the $857.75 then in his possession, and would be given an assignment of the Singletary contract which then had a balance of $3,250. Respondent agreed to supply title insurance in the amount of four thousand dollars. Respondent also agreed to give appellants a Monarch range and a circulating wood and coal heater.

Shortly thereafter, the Bowdens having left, appellants moved to the Thomas street house. A few days later the parties again met in Mr. Dougan's office, at which time the transaction was completed by the exchange of the necessary papers and documents. Sometime later Mr. Ramsey built a woodshed on the back of the lot. The first notice that respondent had that appellants were dissatisfied with the house was during the first week of April, 1948. On April 29, 1948, more than five months after taking possession of the Thomas street property, appellants began this action for rescission of the executed contract of sale.

The evidence leaves little doubt that the Thomas street house was in a dilapidated condition at the time of the trial. Several real-estate agents and other observers, in addition to appellants, testified that many of the posts and sills supporting the house were rotten; that the house had settled several inches at one corner; that this was plainly visible from the inside and outside of the house; that water seeped into the pantry; that the floor under the kitchen linoleum was in poor condition; that water collected in a hole under the house and gave off a disagreeable odor; that the plumb-

ing leaked; that plaster was falling off in some places; and that the front porch was in disrepair. It was also shown that this house had no separate water meter, but shared a meter with the house next door.

On cross-examination of some of these witnesses, it was brought out that, while the house was thirty or forty years old, the roof had been replaced sometime before World War II, and at the same time new floors had been laid in the living room, dining room and bedrooms. There was also testimony that many of the posts had been replaced under the house; that all posts rested on concrete blocks; that the joists were sound; and that the rotted posts could be replaced at an expense of a few hundred dollars.

There was a wide variety of testimony as to the reasonable market value of this property in November, 1947. Respondent had paid $2,250 cash for this place in the middle of 1946. He had then had the house refinished. Shortly thereafter he sold the property to the Bowdens. The contract with them called for a purchase price of $3,500, with a down payment of six hundred dollars and the balance payable at forty dollars a month. In September, 1946, the property had been appraised for loan purposes as having a value of from $3,500 to $4,000, and a $1,500 mortgage was then placed on the property. The assessed valuation of the property for tax purposes was $140 in 1947 and $160 in 1948.

A witness for appellants testified that the cash value of the place in November, 1947, was one thousand dollars, and that, under a conditional-sales contract, a fair price would have been from $1,400 to $1,600. One witness, called by respondent, testified that the high prices of the "sellers'" market continued through 1946 and 1947, but "cracked" in 1948. A real-estate agent selected by the parties at the suggestion of the court, valued the property at $2,700. He stated that, had he known of the property, he would have offered $2,300 cash for it, and would have spent a small amount to recondition the place.

The testimony was that the value of the contract assigned by appellants to respondent as part of the consideration was

something less than its face value. Respondent testified that it could not have sold for more than seventy-five per cent of its face value.

As indicated at the outset of this opinion, the trial court entered judgment dismissing the action.

Appellants' first assignment of error is that the court erred in appointing, on its own motion, Gus Johnson as an additional witness on the question of valuation.

Twice during the course of the trial, Mr. Dunning, counsel for appellants, requested the court to view the Thomas street property before rendering judgment. The court declined to do so, but inquired, instead, whether the parties could agree on some independent person who would look at the property and report to the court what the value was in November of 1947. To this suggestion Mr. Dunning replied: "I think we can." Counsel for respondent made a similar response. Mr. Dunning then urged that the additional witness be a professional appraiser rather than a real-estate agent, saying that there is a "brotherhood amongst real-estate men." The record does not indicate whether or not Mr. Dunning actually agreed upon the selection of Mr. Johnson, prior to Johnson's designation by the court. Johnson is a real-estate agent and not an appraiser. However, when the trial reconvened several days later, the following took place:

"MR. DUNNING: If the Court please, as the Court remembers, the Court appointed an appraiser to go out and appraise this property. THE COURT: Yes. MR. DUNNING: A Mr. Johnson. THE COURT: You may call him."

Mr. Dunning then proceeded to examine the witness on direct and redirect.

■ The weight of authority supports the rule that the trial judge may call witnesses on his own initiative. 5 Jones, Commentaries on Evidence 4460, § 2287. Here the court did not go that far, but only suggested to the parties the desirability of so doing, a course which they apparently agreed upon. The trial court indicated that the designation of a disinterested competent person to view the premises and

report back to the court would be more useful than for the court to view the property, as Mr. Dunning had requested. The trial court has wide discretion in the conduct of trials. *Dunlap v. Seattle Nat. Bank,* 93 Wash. 568, 161 Pac. 364; *Dennis v. McArthur,* 23 Wn. (2d) 33, 158 P. (2d) 644. We think the course pursued here in connection with the designation of Johnson as an additional witness was well within the discretionary powers lodged with the trial court.

In any event, it is clear that this procedure was acquiesced in by appellants. Their counsel called Johnson as a witness and first subjected him to examination. Counsel interposed no objection to Johnson's testimony on this ground, and did not move that such testimony be stricken. An objection to the admission of testimony will not be considered by this court on appeal if it is not timely made in the trial court. *Seth v. Department of Labor & Industries,* 21 Wn. (2d) 691, 152 P. (2d) 976.

The second assignment of error relied upon by appellants is that the court erred in admitting the testimony of James A. Dougan, attorney for appellants, over the objection of appellants that such testimony related to a privileged communication.

The only portion of Mr. Dougan's testimony which appellants appear to rely on in this connection is the statement of the witness that appellants informed him they were satisfied with the Thomas street property. The testimony on this point was as follows:

"A. . . . Anyway before this paper was signed Mr. and Mrs. Ramsey were in the office. Mr. Mading was in the office. And I asked them, the Ramseys, if they were satisfied and if this was the piece of property that they wanted, and also if they had been out and looked at it. And they said they had and this was what they wanted. And it was after that that this—that my secretary prepared this contract, and it was signed. THE COURT: That conversation you last referred to was in the presence of all three of them? A. All three of them were there."

The privilege asserted is provided by Rem. Rev. Stat., § 1214 (2). But only those communications between attor-

ney and client which are intended to be confidential are protected by this privilege. Where the communication is made in the presence of third persons, the confidential nature of the communication has already been waived and the privilege is not available. *In re Quick's Estate,* 161 Wash. 537, 297 Pac. 198; 70 C. J. 433, Witnesses, § 583; 58 Am. Jur. 275, Witnesses, § 492.

This was the situation here. As indicated above, the communication in question was made in the presence of the adverse party. The record shows that only one statement made by Mr. Dougan referred to a private communication between him and appellants. Objection to this statement was taken and promptly sustained. This assignment of error is without merit.

Appellants' third assignment of error relates to the refusal of the trial court to admit certain testimony as to the condition of the Thomas street house. Under this assignment appellants refer to twenty-two separate instances, recorded on twenty separate pages of the statement of facts, wherein the trial court sustained objections to questions or answers relative to the condition of the property. Appellants do not discuss the merits of these rulings individually but argue briefly that a wide latitude is permitted in regard to the admission of evidence to prove knowledge of the falsity of a representation by the vendor.

We have carefully examined each one of these instances and we can detect no error. At an early stage in the trial, the court excluded some testimony regarding the condition of the house on the ground that those particular matters were not within the pleadings. Later, when appellants called attention to the general allegation regarding the dilapidated condition of the house, the court allowed more latitude, and testimony was actually received on practically every item relating to such condition. Some objections were sustained on the ground that the question was too general, or called for a conclusion. Usually the questions were reframed and the desired testimony received in evidence. Several answers to questions were held to be objectionable

because they involved hearsay, or were not responsive to the question.

In addition to their own testimony, appellants produced and examined at length, nine witnesses who testified as to the condition of the Thomas street property. A good deal of this testimony was cumulative, but taken all together it presented a most complete picture of the situation as appellants viewed it. While the court excluded some testimony as to the details of the other real-estate transactions leading up to the Thomas street sale, the general nature of those transactions and a considerable amount of details were received. We conclude that the assignment of error relative to the exclusion of testimony is not well taken.

Appellants' fourth assignment is that the court erred in holding that respondent had not overreached appellants or taken an unconscionable advantage of them. This brings us to a consideration of the merits of the controversy.

■ An executed contract may be rescinded and the amount of the purchase price recovered by a suit in equity where it is alleged and proven that fraud entered into the making of the contract. *Reilly v. Gottleb,* 43 Wash. 9, 85 Pac. 675; *French v. C. D. & E. Inv. Co.,* 114 Wash. 416, 195 Pac. 521; 66 C. J. 813, Vendor and Purchaser, § 456.

■ The elements which must be present to establish a case for rescission because of fraud have been concisely summarized in Corpus Juris as follows:

"In the absence of culpable concealment, there must normally be, as a basis for fraud or misrepresentation affecting the validity of a sale of land, a representation of fact —either of some past or completed act or circumstance or of some present existing fact—which must have been either made or communicated to the person claiming relief. However, a misrepresentation may be as well by deeds or acts as by words, by artifice to deceive as by positive assertions; a false impression produced with a view to entrap or mislead another is fraudulent. Furthermore, the representation must be definite, not vague or inconclusive in character." 66 C. J. 567, Vendor and Purchaser, § 118.

"Silence or concealment as to a material fact, known to one party and unknown to the other, constitutes fraud, when

the other elements requisite thereto exist, if there is a duty, arising from the circumstances, imposed on the former, to speak and disclose the truth; in the absence of any duty of disclosure, however, it does not. Whether there is any such duty depends on the circumstances of the particular case." 66 C. J. 574, Vendor and Purchaser, § 123.

If we were to accept as true all of the testimony produced by appellants, and to reject that produced by respondent, then application of the principles set out above would probably call for rescission here.

Appellants' evidence, however, was directly and completely controverted on all significant points. The trial court, which heard the witnesses and observed their demeanor, apparently placed greater reliance upon the evidence submitted by respondent. The court found that the transaction was free from fraud or overreaching. The oral decision, announced at the close of the case, indicates that the court attached importance to the fact that the purchasers examined the property. The court expressed the view that the purchasers understood what they were doing. The oral decision makes reference to the fact that appellants' own attorney testified that at the time the sale was consummated they advised him that they were satisfied. The trial court indicated that appellants probably paid more than the property was worth, but held that the price was not so out of line with the real value as to be unconscionable.

Our review of the evidence leads us to the same conclusion. There was a great deal of testimony to the effect that the Thomas street house was in poor condition. However, the record discloses little basis for saying that such condition was misrepresented to appellants or purposely concealed from them. Nor is it convincingly shown that respondent remained silent as to defects known by him and not known by appellants.

Fraud is never presumed, and must be proven by clear, satisfactory, and convincing evidence. *National City Bank v. Shelton Electric Co.*, 96 Wash. 74, 164 Pac. 933; *State v. Kosai*, 133 Wash. 442, 234 Pac. 5; *Hopper v. Williams*, 27 Wn. (2d) 579, 179 P. (2d) 283.

According to the testimony, the fact that the house had settled at one corner was obvious on the most casual inspection. This is likewise true of the state of disrepair of the porch, plaster, and the warped floors. That appellants were not deceived as to these conditions is conclusively indicated by Mrs. Ramsey's testimony regarding her remarks, quoted earlier in this opinion, made to respondent during her inspection of the premises. The evidence is in conflict as to whether either of the appellants examined the foundation posts and sills prior to the purchase. But appellants were clearly put on notice, by the settled condition of the house, that the underpinning needed attention.

Appellants' brief inspection of the premises may have been insufficient to bring to their notice some of the other conditions complained of, such as water seepage in the pantry, defective flooring under the kitchen linoleum, and leaky plumbing. But the preponderance of the evidence fails to establish that respondent knew of these conditions, and intentional concealment is therefore not shown. The Bowdens had been occupying the premises for more than a year prior to the sale to appellants. Moreover these items last mentioned are of a relatively minor nature and, standing alone, would hardly justify rescission.

We are mindful of the rule that inadequacy of consideration may be so great as to give rise to a presumption of fraud. *Tausick v. Tausick*, 52 Wash. 301, 100 Pac. 757. But here the trial court specifically held that the price was not so far out of line as to be unconscionable. The trial court's conclusion is clearly supported by the evidence summarized above.

Appellants contend that there was duress here, asserting that respondent refused to return their money placed in his hands as a result of prior transactions. But the evidence was in direct conflict on that point and we have no basis for saying that the trial court was wrong in rejecting this contention. There was no fiduciary relationship between the parties as to the Thomas street transaction. Appellants knew that respondent was acting on his own behalf with respect

to this sale. Appellants were represented by their own attorney, who drew up the contract and satisfied himself that appellants wanted to make this purchase. The evident inequality between the parties in the matter of age, experience and mental alertness, is immaterial where misrepresentation, fraudulent concealment, or failure to make voluntary disclosure of defects known by the seller and not known by the buyer, is not shown. This is the case here. Nor are we able to perceive anything culpable with respect to respondent's handling of the preceding transactions relative to the Ballard and Beacon Hill properties.

Viewed as a whole, it is plain that the decision in this case depends upon the interpretation to be placed upon the conflicting evidence introduced at the trial. We have examined the record with care, and find no reason for holding that the trial court misinterpreted that evidence. As was said in another action for rescission, *Halvorson v. Stecher,* 157 Wash. 257, 259, 288 Pac. 925,

". . . the questions depend for their solution on the view that is taken of the facts of the case, and we cannot conclude that the trial court determined the facts erroneously."

Appellants' last two assignments of error, complaining of the failure to grant a judgment for appellants, and the denial of their motion for judgment notwithstanding the oral decision of the court, or in the alternative for a new trial, are disposed of by what has already been said in discussing the preceding assignments.

The judgment is affirmed.

ROBINSON, MALLERY, and HILL, JJ., concur.

SIMPSON, C. J., concurs in the result.