[No. 39609. Department Two. July 17, 1969.]

VICTOR MARKOV et al., Appellants, v. ABC TRANSFER & STORAGE COMPANY et al., Respondents.*

Robbins, Felix & Robbins, Jennings P. Felix, and Thomas J. Kraft, for appellants.

Wolfstone, Panchot & Kleist, by Lewis S. Armstrong, for respondent ABC Transfer & Storage Company.

Holman, Marion, Perkins, Coie & Stone, J. Paul Coie, and Richard R. Albrecht, for respondent The Boeing Company.

HALE, J.—There are times when the law demands of one an honest declaration of future intentions. If, instead of

*Reported in 457 P.2d 535.

merely predicting future events, he promises to pursue a course of action, the law in all probability will oblige the promisor to keep his word. Even the failure to keep a promise one did not have to make may be as actionable as overt deceit and misrepresentation and in legal effect the equivalent of both.

In 1962, the plaintiffs organized a 15-man copartnership, under the name of Auburn Industrial Center, to purchase from the General Services Administration of the United States the land, storage warehouses, railroad tracks and other facilities comprising a large commercial and industrial tract in Auburn, Washington. Successful in its bid, the partnership bought the property and took possession. On September 15, 1962, the partnership by written instrument leased two of the warehouse buildings to the ABC Transfer & Storage Company, a corporation, for a 3-year term to expire September 14, 1965. The lease agreement contained no renewal provision. Monthly rental payable in advance was fixed at $9,600, with lessee to pay the utilities.

The plaintiff instituted the instant action for unpaid rent. Issues were joined when ABC Transfer & Storage Company, as defendant, denied liability for the rent and counterclaimed for damages caused by the plaintiff's asserted misrepresentations and deception in promising to grant a 3-year renewal.

As part of its responsibility for maintaining the railroad tracks, the partnership (owner of the building) was required to pay to the railroad $5 for each railroad car coming to its warehouses. The lease agreement contained a provison that, if these $5 per car load charges continued and were billed to the lessee, "Lessors agree to absorb such charge by deducting same from Lessee's rental hereunder." But despite lessor's agreement to pay the railroad loading charges, the railroad, not content with the partnership's acknowledgment of liability for them, persistently sent the bills to ABC Transfer & Storage Company for a cumulatively increasing amount. By the time of trial, the railroad loading charges had reached $21,000—an amount

greater than that claimed by plaintiff as unpaid rent. These charges and the railroad's avowed and persistent intention to collect them from ABC together with Auburn Industrial Park partnership's equally persistent failure to pay them figured significantly in helping the trial court to ascertain the parties' intentions and to arrive at the findings of fact.

ABC, with Scott Paper Company—a large national corporation—as its principal customer and occupant, assumed possession. Indeed, so conspicuous and important was Scott Paper's relationship to ABC that both ABC and the partnership carried on subsequent negotiations largely on the basis that both lessor and lessee stood to benefit greatly from Scott Paper's continued business. Because of the continuous process of shipping its products into and out of the warehouse, Scott Paper Company's needs for space fluctuated. Great quantities of its products were brought into the warehouse for storage while, at the same time, loads of its materials were being shipped out for sale and use, necessitating a constant loading and unloading activity.

In February, 1963, the lessors, first verbally and then in writing on May 13, 1963, agreed to a reduction of the rented space from 8 to 4 bays and reduced the monthly rental to $5,650—increasing the rate, however, from the original 3 to $3\frac{1}{2}$ cents per square foot. Then, in October, 1964, the lease was again amended by written agreement to increase the space in one of the buildings to 7 bays with a corresponding increase in the monthly rental to $9,887.50. The modification provided, too, that, in circumstances not material here, the rental would be reduced to $8,475. Apparently the lease agreement was under nearly constant negotiations for modification.

By the time these modifications had been adopted, ABC faced the possibility that the lease would expire within about a year, for it contained no renewal clause and the partnership had placed itself under no legal duty to promise a renewal. ABC was painfully aware that the Scott Paper Company patronage depended in large measure on its capability of giving authentic assurances of continuous

availability. The dire necessity of a firm commitment from the Auburn Industrial Center partnership of a lease renewal precipitated the very events which led to this case.

In February, 1965, about 6 months after the last written lease modification had been executed, Mr. Francis Bury, president and principal stockholder in ABC Transfer & Storage Company, started negotiations for a renewal with Mr. Sidney Eland, a member of plaintiff Auburn Industrial Center partnership. Mr. Eland had been and was one of the main negotiators for the partnership in its rental activities. To aid in the negotiations, Mr. Bury, of ABC, arranged for Scott Paper Company to send its traffic manager, a Mr. Morse, from Philadelphia, Pennsylvania.

Scott Paper Company too had a natural anxiety that the lease be renewed for it was concurrently negotiating with ABC for a new storage and warehousing contract to run from September 15, 1965, to September 15, 1968—a period coextensive with the sought-after lease renewal term. Whether Scott Paper could continue doing business with ABC or had to seek another warehouse depended on the success of ABC's renewal negotiations.

Thus, it was no mere business courtesy when Scott Paper Company in May, 1965, sent its traffic director, Mr. James Morse, from Philadelphia, and a Mr. Stoddard, its traffic manager from Everett, Washington, to Seattle to ascertain whether the Auburn Industrial Park partnership would grant ABC a 3-year renewal.

According to the court's findings, these negotiations were undertaken for the express purpose of extending the lease from September 15, 1965, to September 15, 1968. Mr. Morse for Scott Paper informed the partnership's Mr. Eland that his company was most anxious that ABC be assured of a renewal. The trial court was convinced that the Auburn Industrial Center partnership made representations to ABC Storage and Scott Paper that it would renew the lease for 3 years. On this point, the court expressly found:

> Mr. S. S. Eland, in the presence of Mr. Bury, representing defendant [ABC Storage] assured Mr. Morse at this time that Scott Paper could have anything it wanted.

This was understood by the parties as an assurance by plaintiffs [Auburn Industrial Center partnership] that defendant's lease would be renewed. Mr. Bury, representing defendant, had a right to rely and did rely on such assurance.

Changes in the lease agreement itself were consistent with a finding of a promise to grant a renewal. As late as June, 1965, Mr. Henry V. Benson, one of the partners and the individual to whom ABC had been delivering its rental payments, advised Mr. Bury that the partnership would accept Bury's offer to rent 5 bays in the warehouse from June 15, 1965, to September 15, 1968, at a total rental of $7,312.50 per month—this amounting to an increase of $50 per month per bay over the previous rental. Defendant ABC actually paid this increased rental for the months of June and July, 1965.

The record thus shows substantial evidence to support the court's findings that the partnership over a period of time communicated to ABC its intentions to renew the lease; that ABC relied on such assurances; and that ABC had a right to rely thereon because of the representations made both to it and to Scott Paper Company in May, 1965. Thus relying, it was reasonable, in the trial court's judgment, for ABC to make no preparations for a change in location and to take no steps whatever to maintain the patronage of Scott Paper Company by arranging for another warehouse.

The court found, too, that Scott Paper Company continued to use the space it was leasing from ABC as a major distribution point in the northwestern part of the United States, and in reliance upon the representations made by the partnership to both ABC Transfer & Storage Company and to Mr. Morse, Scott Paper Company's traffic director, that a new lease would be entered into, made no efforts to find another warehouse. During this time, Scott Paper was loading into and out of the warehouse from 6 to 60 railroad cars per week of the company's products.

In the meanwhile, however, the partnership was parleying with others concerning the property. After defendant

ABC Transfer & Storage Company had begun negotiations in February, 1965, for a lease renewal, a real-estate dealer representing an undisclosed principal, informed the partnership in late May or June, 1965, that he had a probable buyer for the ABC Transfer & Storage Company warehouse but insisted that their communications concerning the sale be kept confidential. Thus, while the partnership was conferring with ABC for a renewal of the lease, it was at the same time quietly negotiating for a sale of the premises.

Negotiations between the partnership and the real-estate agent prior to July 1, resulted July 1, 1965, in an option agreement to an undisclosed buyer to sell the Auburn warehouse facility at a price of $4,000,000. Not long afterward, the Boeing Company, the undisclosed optionee, announced that it was exercising the option and, tendering the purchase price, demanded possession. ABC, having no knowledge of the negotiations leading to the pending sale or the sale itself, continued to operate the warehouse on the assumption that its lease would be renewed for a 3-year term. It continued operating on this assumption until it received a categorical notice from Boeing on August 25 to vacate by September 15, 1965.[1]

The trial court found, too, that ABC suffered substantial damage not only from the loss of the leased premises but because of the misleading representations that the lease would be renewed. The court found that other storage space was then available at similar rates and had ABC known, during its negotiations for a renewal, that the lease

---

[1] On this point, the trial court made the following finding of fact No. 11 *inter alia* that:

Plaintiffs at no time disclosed to defendant the fact of the negotiations with the agent for the undisclosed purchaser, nor of the execution of the option agreement which resulted from those negotiations, nor of the exercise of the option, but allowed defendant to continue his warehouse operation on his understanding, obvious to plaintiffs, that his lease would be renewed for a period of three years commencing September 15, 1965. Defendant was first notified of the sale to Boeing Airplane Co., not by plaintiffs, but by the real estate agent who had represented Boeing Airplane Co. in the purchase. He notified defendant by letter dated August 25, that it would have to vacate by September 15, 1965.

would not be renewed, it could have leased another warehouse. ABC showed that, because of the rapid turnover of warehoused materials, it could have made an orderly and inexpensive vacation of the partnership's warehouse and removed the stored goods of Scott Paper Company to a newly leased warehouse at very little cost.

Thus, the court found it to be a fact that had ABC been timely advised that there would be no renewal of its lease, it could, during July, August and the first 2 weeks in September, readily have planned and carried out a removal of Scott Paper's stored materials at little more than the cost of regular operations. By shipping out outgoing materials from the old warehouse and shipping incoming materials to the new warehouse at the average rate of between 6 and 60 railroad cars a week, the court found that ABC could have completed an orderly removal and transfer at a cost of not more than $1,000 plus $18,281.25 rental on the new premises for the 2½ month period. ABC proved to the court's satisfaction, too, that, because of the misrepresentations that the lease would be renewed, it reasonably incurred expenses of $45,598.99, lost the Scott Paper Company account which it would otherwise have retained, and suffered damages thereby in lost profits from the Scott Paper Company contract in the sum of $91,127.88.

The trial court awarded ABC Transfer & Storage Company judgment of $114,934.92 on its counterclaim as damages proximately resulting from the partnership's deceptive and misleading representations that it intended to and would renew the lease for 3 years. The partnership appeals this judgment. Of 14 assignments of error, 10 are leveled at salient findings of fact upon which the judgment largely rests. Other assignments aimed at an allowance of attorneys' fees under the lease agreement, refusal to reopen the case, refusal to find a waiver of rights against an asserted tort-feasor, and the dismissal of the Boeing Company from the case, appear to be without merit and will not be discussed. Our analysis of the assignments discloses that the determinative issues are whether the record supports the

court's affirmative findings of actionable fraud and misrepresentation, and, if so, what damages, if any, proximately resulted therefrom. In other words, did the ABC Transfer & Storage Company prove a case of fraud and misrepresentation upon which damages could be awarded under the rule that fraud must be proved by clear, cogent and convincing evidence?

Appellants contend that no fraud or misrepresentation was proved at all, much less by the clear, cogent and convincing evidence required, and that the so-called promises to renew the lease amounted to no more than unenforceable predictions.

■■ To recover for fraud, the following elements must be proved by clear, cogent and convincing evidence:

(1) a representation of an existing fact; (2) its materiality; (3) its falsity; (4) the speaker's knowledge of its falsity or ignorance of its truth; (5) his intent that it should be acted on by the person to whom it is made; (6) ignorance of its falsity on the part of the person to whom it is made; (7) the latter's reliance on the truth of the representation; (8) his right to rely upon it; (9) his consequent damage.

*Baertschi v. Jordan,* 68 Wn.2d 478, 482, 413 P.2d 657 (1966). *See, also, Swanson v. Solomon,* 50 Wn.2d 825, 314 P.2d 655 (1957). Failure to prove any one of the nine stated elements is fatal to recovery. *Puget Sound Nat'l Bank v. McMahon,* 53 Wn.2d 51, 330 P.2d 559 (1958). Fraud, therefore, is never presumed; to be clear, cogent and convincing, the evidence must be greater than a mere preponderance. *Brown v. Underwriters at Lloyd's,* 53 Wn.2d 142, 332 P.2d 228 (1958); *Ramsey v. Mading,* 36 Wn.2d 303, 217 P.2d 1041 (1950).

■ Predictions, without an express or implied undertaking to make them come true, do not constitute such representations or promises as will support actionable fraud. *Shook v. Scott,* 56 Wn.2d 351, 353 P.2d 431 (1960). Thus, a prediction that an adequate supply of water would be available to the purchaser of land is not the equivalent of a representation that the minimum requirements would

be met. *Nyquist v. Foster,* 44 Wn.2d 465, 268 P.2d 442 (1954). But the rule that mere predictions do not necessarily constitute representations avails the partnership little here. The representations to renew the lease were more than portents of the future. They were promises made by the partnership of its future actions and given under such circumstances of its own creation as to make undertakings of them. If, as the trial court found, the partnership represented to ABC Transfer & Storage Company and Scott Paper Company that it would renew the lease for a term of 3 years and the circumstances surrounding the representations were such that ABC and Scott Paper could reasonably rely thereon, this was no mere prediction of a future event but a promissory undertaking—an undertaking fully supported by consideration to renew the lease for 3 years and to negotiate the amount of rentals in good faith.

We said in *Hewett v. Dole,* 69 Wash. 163, 124 P. 374 (1912), if a promise is made for the purpose of deceiving and with no intention to perform, it constitutes such fraud as will support an action for deceit. Closely related to that rule is the corollary that if the promise is made without care or concern whether it will be kept, and the promisor knows or under the circumstances should know that the promisee will be induced to act or refrain from acting to his detriment, the promise will likewise support an action by the promisee.

Since the record shows substantial evidence to support the court's findings that the partnership represented it would renew the lease, it will be presumed that the court observed the standards of proof required in cases of fraud and found that the evidence was clear, cogent and convincing and met the requirements of that rule. Indeed, all of the circumstances point to the convincing and persuasive character of the evidence. Aside from the testimony of what was said by the parties, there were the cogent circumstances of several modifications of the existing lease and the negotiated increase in space and rental while the partnership was, *sub silentio,* negotiating with an undis-

closed principal for a sale of the leased premises. Not to be overlooked was the obvious benefit to the partnership during negotiations to sell the premises that they be occupied —particularly by a nationally known corporation such as Scott Paper Company, and the added boon that, if the negotiations for a sale fell through, the partnership would still have its tenant and its annual rental. These circumstances tended to corroborate and convincingly support the evidence that the partnership did promise to renew the lease.

Other assignments of error were presented and argued, including an appeal from dismissal of the Boeing Company as an additional defendant. We find these to be without merit and, accordingly, affirm the judgment of the trial court.

HUNTER, C. J., HILL and ROSELLINI, JJ., and ARMSTRONG, J. Pro Tem., concur.