# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| TRACEY KELLY; and NORSTAR INDUSTRIES INC., f/k/a New West Group, Inc., | No. 86441-6-I |
| Respondents, | DIVISION ONE |
| v. | UNPUBLISHED OPINION |
| GREGORY W. SWAIN, | |
| Petitioner. | |

BIRK, J. — The superior court has certified to this court a question concerning the definiteness a promise must have in order to support claims of promissory estoppel, fraud, and negligent misrepresentation. Tracey Kelly alleges that Gregory Swain sold Kelly a business and promised he would later sell Kelly a parcel of land that was needed to economically run the business, but after Kelly had bought the business Swain sold the land to another buyer. The superior court denied Swain's motion for summary judgment, but ruled that Kelly's evidence supported no more than "a general promise" by Swain "to sell a parcel of property without any specifics such as price, timing, etc." We exercise our discretion to reframe the question and strictly limit our review to answering *is a promise lacking the level of definiteness required to establish an enforceable contractual undertaking inadequate to serve as the basis for claims of promissory estoppel, fraud, or negligent misrepresentation*? We answer no, and affirm.

I

In June 2020, Gregory Swain and Tracey Kelly began negotiations for Kelly to purchase Norstar Industries, Inc. Norstar manufactures commercial roadside equipment, such as chemical injection sprayers and anti-icing systems. Across the street from Norstar's office was a property owned by Swain and his wife. Norstar leased 10,000 of the 56,150 square foot property for $1,000 per month, using it for equipment storage and staging of production.

In July 2020, while Kelly was touring Norstar's office, Swain took him across the street to the property and told him, " 'You need this. It's critical to the day-to-day operations.' " Swain said, " 'Buy the business first, and then I'll sell you the land.' " Kelly made notes he says are quotations from Swain, such as " 'You need property across street,' " " 'I can hold paper,' " " 'You need this property. It won't work [without] it,' " " 'My land is critical for you. You have to have it . . . I will work [with] you and I will finance purchase – You need it.' " Swain allegedly told Kelly to " 'plan on building' " a building on his land, and " 'once the company is yours we can get [the] land done.' " Additionally, early in negotiations, Swain shared some information about the property with Kelly, including a satellite map, the deed, and zoning information.

Kelly asserts that a business broker, Scott Lundt, represented Swain, and that in Kelly's conversations with Lundt they agreed to a $400,000 purchase price at a four percent interest rate. To support the assertion that Lundt was acting as Swain's agent, Kelly claimed that Lundt told Swain, "I will speak for Greg." Lundt disputed that he had ever " 'offered and promised' that Greg Swain would sell the

Property to Mr. Kelly," and he disputed making "any offers or promises to Mr. Kelly on behalf of Mr. Swain regarding the sale of the Property or otherwise." The superior court ruled "these facts [do] not demonstrate any agency relationship between" Swain and Lundt, and it struck Lundt's statements as hearsay. We are not asked to revisit this ruling.

In September 2020, Kelly sent Swain a letter of intent. This letter of intent was "intended solely as a basis for further discussions between the parties," and did not "constitute a legally binding agreement." It included a provision related to the property stating,

> **Commercial Land.** Concurrently with Buyer's purchase of the Assets, Buyer will purchase, via a separate written agreement, from Gregory and Barbara Swain, a mostly undeveloped parcel of land zoned for commercial use located at 203 23rd Street SE, Auburn, WA 98002, tax parcel number 869520-0057-01 (the "Commercial Lot"). The purchase price for the Commercial Lot shall not be less than $133,000, but any amount in excess will be contingent upon the results of a title report, county assessment, Buyer's review and approval of all rental agreements, leases or other contacts relating to the Commercial Lot, and corresponding financial analyses. For removal of doubt, Buyer's acquisition of the Commercial Lot is expressly contingent upon Buyer's or Buyer's affiliate's purchase of the Company Assets in accordance with Paragraph 2, above."

In October 2020, Kelly sent Swain a second letter of intent. The second letter differed from the first, granting Kelly "the option but not the obligation to purchase, via a separate written agreement," the property for a "mutually agreeable purchase price." Like the first letter, the second letter was "intended solely as a basis for further discussion between the parties" and did not "constitute a legally binding agreement." The parties signed the second letter of intent, and Swain represents he signed the first one as well.

3

On March 15, 2021, the parties signed a purchase and sale agreement (PSA) for Norstar. One of the "conditions precedent to obligations of [the] buyer" included in the PSA was that Swain would deliver to Kelly "a written agreement under which [Swain] agrees to lease to [Kelly] upon mutually agreeable terms the plot of land adjacent to the Premises currently being used by the Business as excess storage." The PSA also includes an integration clause, stating the PSA "represents the entire understanding and agreement between the parties hereto with respect to the subject matter thereof and supersede[s] all prior oral and written agreements negotiations and understandings between such parties." The parties closed on the transaction in July 2021.

Later, Kelly claimed that Swain had misrepresented the health of the business, that sales were down, costs were up, and the inventory he had acquired was worth less than half of what he had paid for it. Kelly met with Swain in October 2021, where, he asserts, Swain again emphasized the importance of the property, "You need [to] buy it, I want you to have it." Kelly met with Swain again later in October, outlining his issues with the Norstar acquisition in a "meeting agenda." (Capitalization and boldface omitted.) On November 16, 2021, Kelly sent Swain a settlement offer "to settle the various breaches" of the PSA. Kelly proposed that Swain pay Kelly $604,085 and sell Kelly the property for $400,000, financed by Swain at a 4 percent interest rate.

Swain responded to Kelly's proposal by e-mail, telling him, "There will be no discussion with you regarding the sale of my property across the street. I informed you after your first offer to purchase Norstar that the property would not be included

in any further negotiations and that is still the case." Kelly replied, "You told me specifically that I had first right of refusal on that property. You said repeatedly that Norstar 'needed' that property for storage. You even commented about the type of building that could be erected there." At a meeting on November 23, 2021, Swain made a counterproposal which Kelly rejected. Kelly attempted to discuss sale of the property again but Swain told him that he would not sell it and that it was worth more than one million dollars.

The next day, November 24, Swain agreed to sell the property to Bob Moate for $1,500,000, financed by Swain at 4 percent interest, with a three year guarantee by Moate to lease a minimum of 7,000 square feet at fair market lease rates to Norstar. The parties finalized the transaction in December 2021 and closed in January 2022. Moate increased Norstar's rent while reducing the square footage leased.

Kelly filed a complaint against Swain alleging claims for promissory estoppel, fraud, misrepresentation, and unjust enrichment. In the complaint, Kelly alleged that Swain had promised to sell the property to him, and that the price Kelly agreed to pay for the business was in part based on a belief that Swain would sell him the property. Kelly alleged that Norstar would have to relocate to new premises due to the "unexpected expenses and other business-related costs" caused by Swain's alleged fraud. During discovery, Kelly alleged different bases for damages, stemming from an alternative location, staging, lease of property, the purchase price of Norstar, and loans.

Swain moved for summary judgment, arguing that Kelly was a sophisticated businessperson, represented by counsel, who "*hoped*" and "*planned*" to buy the property after acquiring Norstar, but that Swain was under no obligation to sell it to him, and that the parties never entered into any agreement on the material terms for the sale of the property. Swain argued, "At most there was an agreement to agree." Swain sought dismissal of all claims. In response, Kelly argued that Swain had a duty to not make misrepresentations to induce Kelly to buy Norstar, that Swain had made a promise to sell the lot "for $400,000 at four percent interest," and that there were disputed facts resolvable only by a jury.

The superior court ruled that there was "no genuine dispute that no specific purchase price for this property was ever agreed to by the parties, that an agreement between the parties contemplated a lease on the property in question, and that ultimately the property in question was sold to someone else." However, the superior court denied the motion, ruling that "on this present record, genuine issues of material fact exist." The superior court then certified the question, sua sponte, for interlocutory review under RAP 2.3(b)(4), "whether a general promise to sell a parcel of property without any specifics such as price, timing, etc. can support claims for negligent misrepresentation, fraud, and/or promissory estoppel." A commissioner of this court granted discretionary review on the basis of RAP 2.3(b)(4). To focus our analysis, we have exercised our discretion to re-frame the question as stated above. See RAP 2.3(e); State v. LG Elecs., Inc., 185 Wn. App. 123, 151, 340 P.3d 915 (2014) (appellate courts determine the scope of discretionary review).

II

The standard of review for an order of summary judgment is de novo. Smith v. Safe Ins. Co., 150 Wn.2d 478, 483, 78 P.3d 1274 (2003). Applying de novo review, we review each of Kelly's extra-contractual claims—promissory estoppel, fraud, and negligent misrepresentation—in turn.

A

The purpose of promissory estoppel is " 'to make a promise binding, under certain circumstances, without consideration in the usual sense of something bargained for and given in exchange.' " Klinke v. Famous Recipe Fried Chicken, Inc., 94 Wn.2d 255, 261 n. 4, 616 P.2d 644 (1980) (quoting Raedeke v.Gibraltar Sav. & Loan Ass'n, 10 Cal. 3d 665, 672-73, 517 P.2d 1157 (1974)). Promissory estoppel has five required elements,

> (1) [a] promise which (2) the promisor should reasonably expect to cause the promisee to change his position and (3) which does cause the promisee to change his position (4) justifiably relying upon the promise, in such a manner that (5) injustice can be avoided only by enforcement of the promise.

Wash. Educ. Ass'n v. Wash. Dep't of Ret. Sys., 181 Wn.2d 212, 224-25, 332 P.3d 428 (2014) (alteration in original). "A promise is a manifestation of intention to act or refrain from acting in a specified way, so made as to justify a promisee in understanding that a commitment has been made." Id. at 225 (quoting RESTATEMENT (SECOND) OF CONTRACTS § 2(1) (1981)). It is the promise that is the " 'sine qua non of promissory estoppel.' " Havens v. C & D Plastics, Inc., 124 Wn.2d 158, 173, 876 P.2d 435 (1994) (quoting Hunt v. Great W. Sav. Bank, 54 Wn. App. 571, 576 n.4, 774 P.2d 554 (1989)). Reliance may not "counterbalance

the absence of the required promise." Id. Klinke is representative of many Washington cases applying promissory estoppel, stating, "promissory estoppel requires the existence of a promise." 94 Wn.2d at 258-59.

The Washington Supreme Court has been more specific about the definiteness required for a promise to support promissory estoppel in the specific context of the terminable at will doctrine. In Havens, the court held, "We agree with the weight of authority that where the terminable-at-will doctrine is concerned, the promise for promissory estoppel must be a 'clear and definite promise.' " 124 Wn.2d at 173 (quoting 1 Paul H. Tobias, Litigating Wrongful Discharge Claims § 4.52, at 4-89 (1993)). Applying this standard, Havens held that statements typical of the interviewing process, the nature of the prospective job duties, and anticipated compensation did not amount to "a clear and definite promise of permanent employment subject only to dismissal for just cause." Id. at 174. The court explained, "[p]laintiff's own expectations do not constitute a promise by the employer." Id. at 175.

The "clear and definite" standard to support promissory estoppel is not unique to Washington, and it has been said, "Although the promise must be clear and definite, it need not be the equivalent of an offer to enter into a contract because '[t]he prerequisite for . . . application [of the doctrine of promissory estoppel] is a *promise* and not a bargain and *not* an *offer*.' " Stewart v. Cendant Mobility Servs. Corp., 267 Conn. 96, 105, 837 A.2d 736 (2003) (alterations in original) (quoting 3 A. Corbin, Contracts § 8.9, p. 29 (Rev. Ed. 1996)); accord Hoffman v. Red Owl Stores, Inc., 26 Wis. 2d 683, 697-98, 133 N.W.2d 267 (1965)

8

(Promissory estoppel is not restricted to situations in which "the promise giving rise to the cause of action" is "so definite with respect to all details that a contract would result were the promise supported by consideration."). Other courts "require that the promise or agreement be clear, definite, and unambiguous as to essential terms before the doctrine of promissory estoppel may be invoked to enforce an agreement or to award damages for the breach thereof." Lohse v. Atl. Richfield Co., 1986 ND 11099, 389 N.W.2d 352, 357. But "the discernible trend of recent decisions is moving away from the view that promissory estoppel is inapplicable as a theory of recovery when the promise is indefinite or incomplete." Neiss v. Ehlers, 135 Or. App. 218, 224-25, 899 P.2d 700 (1995).

Swain argues that an oral promise to sell the property to Kelly would be unenforceable due to the statute of frauds. Washington takes a strict view of the statute of frauds contained within the Uniform Commercial Code, Title 62A RCW. See Lige Dickson Co. v. Union Oil Co. of Cal., 96 Wn.2d 291, 299-300, 635 P.2d 103 (1981) ("We join the other courts which limit the doctrine of promissory estoppel from overcoming a valid defense based on the statute of frauds contained within the Uniform Commercial Code."). In that context, "promissory estoppel cannot be used to overcome the statute of frauds in a case which involves the sale of goods." Id. at 299. But Washington has not extended this rule to promissory estoppel in common law contexts generally. And while In re Estate of Nelson, 85 Wn.2d 602, 611, 537 P.2d 765 (1975), and Klinke, 94 Wn.2d at 260, both involved oral promises to execute a writing that would have met the statute of frauds, neither case limited enforcement of a promise as an exception to the statute of frauds to

9

that precise kind of promise. To so hold would run counter to <u>Markov v. ABC Transfer & Storage Co.</u>, where an oral promise of a three year lease was actionable despite no evidence that the promise was promised to be reduced to a writing. 76 Wn.2d 388, 396, 457 P.2d 535 (1969).

Thus, Kelly's claim for promissory estoppel does not fail merely because Swain's promise lacked the material terms that would be required to form a contract. This answers the certified question as to promissory estoppel as we understand it.[1]

B

To prevail on a fraud claim, the plaintiff must prove by clear, cogent, and convincing evidence,

'(1) a representation of an existing fact; (2) its materiality; (3) its falsity; (4) the speaker's knowledge of its falsity or ignorance of its truth; (5) his intent that it should be acted on by the person to whom it is made; (6) ignorance of its falsity on the part of the person to whom it is made; (7) the latter's reliance on the truth of the representation; (8) his right to rely upon it; (9) his consequent damages.'

---

[1] While we do not comment further on the requirements for promissory estoppel or the resolution of Kelly's claims, we add that this conclusion does not make an indefinite promise enforceable. "Although promissory estoppel may apply in the absence of consideration, the doctrine may not be used as a way of supplying a promise." <u>Elliott Bay Seafoods, Inc. v. Port of Seattle</u>, 124 Wn. App. 5, 13, 98 P.3d 491 (2004). Kelly cannot enforce, as though enforcing a contract, a promise by Swain to sell the land on specific terms or at a specific price. If all elements of promissory estoppel are proved, while the available remedies are "more flexible in nature than contract remedies," they are nevertheless "aimed at compensating the promisee for *damages that result from actions in reliance on the promise*, rather than providing comprehensive contract relief for the breach of the indefinite promise itself." <u>Neiss</u>, 135 Or. App. at 228 (emphasis added).

Markov, 76 Wn.2d at 395 (quoting Baertschi v. Jordan, 68 Wn.2d 478, 482, 413 P.2d 657 (1966)). "Predictions without an express or implied undertaking to make them come true, do not constitute such representations or promises as will support actionable fraud." Id. In defining "misrepresentation of intention," the Restatement (Second) of Torts § 530 (Am. Law Inst. 1977), explains that "[a] representation of the maker's own intention to do or not do a particular thing is fraudulent" if the maker "does not have that intention." In the comment to § 530, comment on subsection (1)(c), the Restatement further explains,

> The rule stated in this Section finds common application when the maker misrepresents his intention to perform an agreement made with the recipient. The intention to perform the agreement may be expressed but it is normally merely to be implied from the making of the agreement. Since a promise necessarily carries with it the implied assertion of an intention to perform it follows that a promise made without such an intention is fraudulent and actionable.

Similarly, comment f to Restatement (Second) of Torts § 525 explains in regard to fraudulent misrepresentation, "a statement that is in form a prediction or promise as to the future course of events may justifiably be interpreted as a statement that the maker knows of nothing which will make the fulfillment of his prediction or promise impossible or improbable." This is sometimes called "promissory fraud." See Lazar v. Superior Court, 12 Cal. 4th 631, 638, 909 P.2d 981 (1996). In promissory fraud cases, "the plaintiff's claim does not depend upon whether the defendant's promise is ultimately enforceable as a contract." Id.

In Markov, a partnership leased storage space to ABC, which was integral to ABC's business. 76 Wn.2d at 390. With the expiration of the lease approaching, ABC negotiated with the partnership for a lease renewal, and it received the partnership's assurances that a renewal would be forthcoming. Id. at 392. However, unbeknownst to ABC, the partnership was simultaneously negotiating for the sale of the storage facilities. Id. at 393. The partnership sold the facilities, and the new landlord did not renew ABC's lease. Id. The court held that the partnership's representations that it would renew the lease for three years was a promissory undertaking, rightfully relied on by ABC, and sufficient to constitute fraud. Id. at 396.

In Mastaba, Inc. v. Lamb Weston Sales, Inc., Mastaba made significant investments in a test kitchen, relying on the defendant's assertions that the plaintiff's " 'long term position, " with the defendant was "secure" and that if the plaintiff made the investment, defendant's agent " 'would get Mastaba a long term contract.' " 23 F.Supp.3d 1283, 1288-89 (E.D. Wash. 2014). After completion of the test kitchen, Mastaba requested a long term contract, but in response the defendant's agent disclosed that he lacked the authority to enter into such agreements. Id. at 1289. Ultimately, Mastaba received more short term contracts at increasingly unfavorable terms. Id. The defendant's promises, despite lacking definiteness in terms, were sufficient to present a genuine issue of material fact as to fraud. Id. at 1293. The defendant's agent had promised to " 'look into' " a five year contract, and never did so, and he promised a five year contract which he lacked the authority sign. Id.

Thus, a representation of intention in the form of a promise, that is false when made and otherwise meets the elements of fraud, may support a claim for fraud even if the promise lacks the material terms necessary to form a contract.

C

To prevail on a negligent misrepresentation claim, the plaintiff must prove by clear cogent and convincing evidence that

> (1) the defendant supplied information for the guidance of others in their business transactions that was false, (2) the defendant knew or should have known that the information was supplied to guide the plaintiff in his business transactions, (3) the defendant was negligent in obtaining or communicating the false information, (4) the plaintiff relied on the false information, (5) the plaintiff's reliance was reasonable, and (6) the false information proximately caused the plaintiff's damages.

Ross v. Kirner, 162 Wn.2d 493, 499, 172 P.3d 701 (2007). Information communicated in the form of opinion can satisfy the false information element. See Lawyers Title Ins. Corp. v. Baik, 147 Wn.2d 536, 547, 55 P.3d 619 (2002) ("We decline to hold as a matter of law that, contrary to the *Restatement*, a negligently obtained and ultimately inaccurate opinion could not satisfy the 'false information' element of a negligent misrepresentation claim.").

Here as well, information supplied in the form of a promise, that is false when made and otherwise meets the elements of negligent misrepresentation, may support that claim even if the promise lacks the material terms necessary to form a contract.

III

To the extent of our answer to the certified question as we have reframed it, we affirm the superior court's denial of Swain's motion for summary judgment, and remand for further proceedings.

_Birk, J._

WE CONCUR:

_Feldman, J._          _Díaz, J._