# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| STATE OF WASHINGTON, | DIVISION ONE |
| Respondent, | No. 78868-0-I |
| v. | |
| JEROMY KEITH LADWIG, | UNPUBLISHED OPINION |
| Appellant. | |

DWYER, J. — Jeromy Ladwig was convicted of vehicular homicide after a jury trial. On appeal, he avers that the State's questioning of prospective jurors during voir dire—specifically, whether any jurors had strong feelings about methamphetamine use and whether a juror who knew Ladwig personally could be unbiased—prejudiced the jury as a whole, resulting in an unfair trial. Relatedly, he alleges that the questioning amounted to prosecutorial misconduct, that the trial court erred by not granting his motion for a mistrial, and that cumulative error deprived him of a fair trial. Ladwig makes further assignments of error in a statement of additional grounds. Finding no error, we affirm.

I

At about 4:00 a.m. on May 2, 2016, Nathan Dee was driving his pickup truck to work at Naval Air Station Whidbey when he approached a gravel road

Citations and pin cites are based on the Westlaw online version of the cited material.

leading into Joseph Whidbey State Park. Dee was driving at or about the speed limit of 40 miles per hour, had his headlights and fog lights on, and was on alert for deer in the area. Suddenly, without warning, a bright light appeared to the left of his vehicle, followed by a loud collision. The force of this collision caused Dee's truck to rotate, strike a power pole, and roll onto its side in a ditch.

After climbing out of a window of his truck, Dee saw a Ford Mustang in a nearby field and waved down a passing motorist for assistance. Approaching the Mustang, he saw the defendant, Jeromy Ladwig, standing outside the vehicle's passenger door. A front seat passenger, Keesha Harden, was pinned inside and covered in blood. A second passenger, Randon Koepke, had his legs pinned behind the passenger seat while the rest of his body lay on the vehicle's trunk. Dee attempted to keep the three calm until first responders arrived.

At 4:18, Sergeant Cedric Niiro of the Oak Harbor Police Department arrived and observed that Ladwig's speech was slurred and difficult to understand. Officer Patrick Horn, also of the Oak Harbor Police Department, arrived shortly thereafter and observed the same. Both observed that Harden was unconscious and suffered from labored breathing and a significant head injury. Ladwig, upon questioning, denied taking any drugs that could have affected his driving.

Firefighters soon arrived and extracted both Koepke and Harden from the vehicle. After he had been removed and placed in an ambulance, Koepke requested his backpack. Briefly checking the backpack for weapons, Deputy Gene Martin of the Island County Sheriff's Department observed what looked like

a methamphetamine pipe and a baggie of methamphetamine. Meanwhile, all of the officers who observed Dee saw no signs of impairment.

Harden was transported to WhidbeyHealth Medical Center, where she was found to be suffering from massive internal bleeding and a severe brain injury. She was then airlifted to Harborview Medical Center in Seattle, where she died in surgery. Ladwig was also transported to WhidbeyHealth Medical Center and was noted as having suffered minor injuries. However, Ladwig exhibited bizarre behavior that led an emergency room physician to order a drug screen. This drug screen showed both methamphetamine and amphetamine in Ladwig's system.

At 5:12 a.m., Trooper David Martin of the Washington State Patrol contacted Ladwig at the hospital and immediately noticed Ladwig's slow, slurred speech—affected to the point that Martin could only understand every third or fourth word that Ladwig uttered. He also noted that Ladwig could not correctly state where the vehicular collision occurred. Martin was unable to conduct any field sobriety tests of Ladwig due to Ladwig's supine state. His questioning of Ladwig led only to an admission that Ladwig had two inhalers and had taken "hydrocoxine." Believing Ladwig to be under the influence of drugs, Martin obtained a search warrant for a blood draw. Subsequent testing revealed that Ladwig's blood contained 0.24 mg/L of methamphetamine and 0.06 mg/L of amphetamine. Ladwig was charged with vehicular homicide.

Ladwig pleaded not guilty to this charge. While Ladwig awaited trial, his attorney and the State's attorney both sought and received several continuances

for various reasons, principal among those reasons being the need for both parties to find expert witnesses. A total of 21 months passed between the day Ladwig was charged and his trial. On April 20, 2017, Ladwig also made a motion to substitute counsel, which was granted.

Trial began on June 19, 2018. Shortly before commencing voir dire, the trial court inquired as to any particular questions the prosecutor or defense counsel wanted the court to ask of the potential jurors before the attorneys commenced with their own questions. Defense counsel requested that the court inquire of each potential juror, individually and outside the presence of the other jurors, "about their feelings about those—those drugs [methamphetamine and amphetamine] insofar as they impact on a case such as this." The prosecutor opined that such questioning "can be done in front of the entire panel. It would save a lot of time and might get a good discussion going is my position."

Initially, the court indicated that it would ask the entire panel as to whether any individuals had strong feelings about the use of methamphetamine or amphetamine generally, and would then individually question those who raised their hands. However, the court expressed concern that "it's going to make this too burdensome, in fact, it would be very long to be able to ask each one outside the presence of the jurors."

Upon the court's inquiry of the venire, 29 potential jurors raised their hands to indicate their strong feeling regarding the use of the two drugs. The court then indicated that it would not be questioning all 29 of these potential jurors individually and instead would question them as a group.

4

When the court asked if any potential jurors had heard of the State v. Ladwig case, potential juror 5 raised his hand. When asked to explain how he knew about the case, without revealing any details, juror 5 stated, "Hmm. Social media. I know the defendant. I also do Bible study in Island County Jail for about the last 20 years. I've known Jeromy for like 15 years." Juror 5 indicated that he had not formed an opinion about the case, but stated that he knew someone who had.

When the court inquired as to whether anyone knew Ladwig, juror 5 raised his hand. Asked about his relationship to Ladwig, juror 5 stated, "I would say that we're friends, but mostly our relationship takes place in the library at the Island County Jail." Juror 5 also indicated that he had strong feelings about the use of methamphetamine or amphetamine after seeing methamphetamine addicts at the county jail, and that his coworkers would suffer if he was not present at work. When questioned later, juror 5 stated that he had seen Ladwig once or twice "out on the street."

Ultimately, the court decided to question the 29 jurors who had expressed concern about drug use as a subgroup, apart from the other potential jurors. However, prior to the court beginning this process, Ladwig moved to dismiss the entire jury panel. This request was based both on juror 5's indication that he knew Ladwig from jail and the number of jurors who asserted strong feelings about the use of methamphetamine. The court, however, agreed with the State that any prejudice resulting from these circumstances was curable with a proper jury instruction.

5

The 29 potential jurors who expressed strong feelings about the use of methamphetamine or amphetamine were questioned as a group by both parties, and each juror who indicated that they could not be, or were uncertain as to whether they could be, fair and impartial was excused for cause. Ladwig objected when the State moved to dismiss juror 5 for cause. The court did not excuse juror 5 for cause. The State later used one of its peremptory challenges to dismiss juror 5. Ladwig did not exhaust his peremptory challenges.

Ladwig testified in his own defense at trial. He stated that he was working as a paid driver for Koepke on the morning of May 2, 2016, and had not consumed any methamphetamine. He claimed that he turned onto the gravel park road to return to Oak Harbor based on the request of a passenger, stopped at a stop sign at the end of the gravel road, and looked both ways and signaled before moving into the intersection where he was struck by Dee's pickup. Later, Ladwig stated that he was going less than 15 miles per hour at the time of the collision, had not had time to accelerate on the gravel road, and was struck from the rear. This testimony was contradicted by Ladwig's own expert, who opined that Ladwig was driving at least 29 miles per hour at the time of the collision and did not stop at the stop sign.

In addition, Ladwig's testimony was also contradicted by the State's expert. Detective Kevin Nelson of the Washington State Patrol testified that, based on data from the crash scene, Ladwig's vehicle was traveling 36 miles per hour at the time of impact. According to Nelson's testimony, Ladwig's vehicle could not have reached this speed if Ladwig had stopped—or even if he had

6

merely slowed his vehicle to five miles per hour—at the stop sign. He also indicated that it would have been impossible for Ladwig's vehicle to propel Dee's larger truck off of the road if it had been going at a slower speed.

Ultimately, the jury found Ladwig guilty. Although he had been charged with vehicular homicide under all three prongs of the vehicular homicide statute, RCW 46.61.520, the jury convicted Ladwig on only two of the prongs, declining to find that he operated a motor vehicle under the influence of drugs. The court imposed upon Ladwig a standard range sentence of 144 months of confinement. He appeals.

II

Ladwig first contends that the trial court abused its discretion when it declined to conduct individual voir dire regarding jurors' feelings about methamphetamine use. This is so, Ladwig asserts, because without individual voir dire, prospective jurors shared personal reasons for their feelings about methamphetamine use with the jury pool as a whole, and hearing these sentiments tended to bias the remaining members of the jury pool against methamphetamine users. We disagree.

The United States and Washington constitutions guarantee criminal defendants the right to trial by an impartial jury. U.S. CONST. amend. VI, XIV; WASH. CONST. art. I, §§ 3, 22; State v. Davis, 141 Wn.2d 798, 824, 10 P.3d 977 (2000). Because of the nuances and subtleties presented by voir dire, the trial judge is vested with considerable latitude in ruling on the limits and extent of voir dire. Davis, 141 Wn.2d at 825-26; State v. Frederiksen, 40 Wn. App. 749, 753,

7

700 P.2d 369 (1985). "[A]bsent an abuse of discretion and a showing that the rights of an accused have been substantially prejudiced, a trial court's ruling on the scope and content of voir dire will not be disturbed on appeal. Davis, 141 Wn.2d at 826. Thus, to prevail on his contention, Ladwig must demonstrate that (1) the trial court abused its discretion in conducting voir dire, and (2) his rights were substantially prejudiced. Davis, 141 Wn.2d at 826. He does neither.

Ladwig argues that, because some potential jurors expressed strong feelings against drug use in the presence of the rest of the venire, the entire jury pool was prejudiced and he was denied an impartial jury. However, his appellate argument relies on snippets of individual utterances divorced from the greater context of voir dire. For example, he quotes juror 2, a former employee of the Department of Corrections, as saying that he had "seen a lot [of] people incarcerated over many years and mess up their lives with methamphetamine." He does not quote the following exchange that occurred after juror 2 uttered that thought:

> [PROSECUTOR]: So Juror No. 2.
> PROSPECTIVE JUROR 2: Yes, sir.
> [PROSECUTOR]: So I don't remember if [defense counsel] asked you if you could be impartial, but—
> PROSPECTIVE JUROR 2: Actually, he never asked me if I could be impartial.
> [DEFENSE COUNSEL]: (Chuckling). We're just learning.
> [PROSECUTOR]: Okay. Yeah. If I'm asking you that, what I'm really asking you is if you were a juror on this case you would sit in the jury box over there (indicating) and you would listen to people testify up here (indicating) at the—at the podium.
> You would have exhibits most likely to look at. And so that—that would be the evidence of the case.
> The judge would then give you Instructions, written Instructions. And that's the law that would apply to the case. So

8

you would have to consider those Instructions and how the evidence and those two combine to come to a verdict on this case.

So what these questions are getting at is: Based on your experiences—Everybody comes into Court with different experiences, different life history. And it's okay to know different things than the other person next to you. And it's okay to have all these different experiences.

What we're asking is: Can you put aside these experiences in order to be fair?

Not to let—Some of you have some horrible experiences with meth. So there's certainly going to be instances where that's going to overwhelm your ability to rationally apply the law and the facts together, but . . .

So what we're asking is: Can you be rational? Can you put that aside and be fair or rational?

Not have an overly emotional response and not going to hear it and decide one way or the other based on your emotions.

That's kind of where I'm getting at. So I'm going to go through a bunch of you. Hopefully that made sense.

Now that I've said that, Juror No. 2, can you be fair and impartial?

PROSPECTIVE JUROR 2: Well, after—Having worked in the Department of Corrections for 30 years, I don't think you could be successful in that job without being fair and impartial.

[PROSECUTOR]: Okay.

PROSPECTIVE JUROR 2: You have to apply the laws and the rules evenly amongst everyone and you have to do it in a manner that's fair to everybody.

Ladwig is correct that many members of the venire initially expressed strong negative attitudes about methamphetamine use. This is not atypical for voir dire: the primary purpose of voir dire is to give litigants the opportunity to explore potential juror attitudes. Lopez-Stayer v. Pitts, 122 Wn. App. 45, 51, 93 P.3d 904 (2004). The question for our review is not whether a potential juror expressed strong feelings about a topic material to Ladwig's case but, rather, whether the court was able to seat an impartial jury. Here, after questioning the group of jurors that expressed strong feelings about methamphetamine use, every potential juror who either indicated that he or she could not be, or were not

certain they could be, fair and impartial was stricken for cause. Only after these jurors were dismissed was the jury reconstituted for further questioning.[1]

The trial court was thorough in conducting voir dire and acted within its discretion. Ladwig does not establish that the process resulted in bias among the remaining jurors.

Ladwig also fails to show prejudice. Davis, 141 Wn.2d at 826. Ladwig was charged with vehicular homicide under all three means provided for that crime in RCW 46.61.520. The jury found that he operated a motor vehicle in a reckless manner and with a disregard for the safety of others, two of the means set forth. But the jury did not find that he operated a motor vehicle while under the influence of intoxicating liquor or any drug. It is logically inconsistent to believe that the jury was biased against drug users as a result of the voir dire process when it did not find that Ladwig had been driving under the influence.

Furthermore, abundant evidence supported Ladwig's conviction. Ladwig testified that he made a U-turn after entering the park road and stopped at the stop sign to look both ways. Ladwig's own expert, Dave Wells, directly contradicted Ladwig's testimony, stating that there was nothing to indicate Ladwig made a U-turn or that he stopped at the stop sign. Wells's testimony was consistent with Dee having had the right-of-way and traveling slower than the posted speed limit. It was also consistent with Ladwig having accelerated for a

---

[1] The State takes the position that, because Ladwig did not exercise all of his peremptory challenges, he is barred from raising any issue regarding the jury's composition. However, Ladwig's argument is that the *entire* venire, not just a potential juror, was biased against methamphetamine users as a result of voir dire. The authorities cited by the State do not address the circumstances presented here.

distance of at least 70 feet before reaching the stop sign and passing it at 29 miles per hour. Wells also testified that visibility at the intersection was not an issue and that Dee's truck, with its headlights on, would have been visible to a driver who had stopped at the stop sign. This testimony, from Ladwig's own expert, describes actions a jury could find constitutive of operating a motor vehicle in a reckless manner and with a disregard for the safety of others.

The jury was instructed:

> To operate a motor vehicle in a reckless manner means to drive in a rash or heedless manner, indifferent to the consequences.
> Disregard for the safety of others means an aggravated kind of negligence or carelessness, falling short of recklessness but constituting a more serious dereliction than ordinary negligence. Ordinary negligence is the failure to exercise ordinary care. Ordinary negligence is the doing of some act which a reasonably careful person would not do under the same or similar circumstances or the failure to do something which a reasonably careful person would have done under the same or similar circumstances. Ordinary negligence in operating a motor vehicle does not render a person guilty of vehicular homicide.

Jury Instruction 12.

As the prosecutor stated in the State's summation:

> [Defense counsel] doesn't think that's racing. Fine. Maybe it isn't racing, but it sure as heck isn't stopping at the stop sign. And it sure as heck isn't looking to see if there's cars coming.
> It sure as heck is driving in a rash and heedless manner with disregard for the consequences. The consequences of which there might be a truck coming along here . . . to a guy driving to work at the Navy base to go launch jets.

Both Ladwig's expert and the State's expert testified that Ladwig accelerated on the dirt road without stopping at the stop sign. Detective Nelson testified that Ladwig's vehicle was moving at 36 miles per hour at the time of the

collision, and that attaining such a speed would have been impossible had Ladwig stopped at the stop sign. Wells testified that Ladwig's vehicle was moving over 20 miles per hour when Ladwig passed the sign. The testimonial evidence from both experts is consistent with Dee's eyewitness testimony that Ladwig's vehicle appeared very suddenly before striking his own. In addition, if Ladwig's vehicle had come to a complete stop or even slowed down, it could not have attained the momentum necessary to propel Dee's larger truck off of the road. Indeed, the testimony of the two experts supports the logical inference that, had Ladwig come to a complete stop, Dee's vehicle would have cleared the intersection without having been contacted by Ladwig's vehicle.

Given the lesser standard for finding disregard for the safety of others as opposed to recklessness, the evidence was more than sufficient to find Ladwig guilty under both of these prongs. That the jury declined to find that Ladwig operated his vehicle under the influence of a drug, when abundant circumstantial evidence of his methamphetamine use existed, logically undercuts his claim of prejudice resulting from voir dire.

III

Next, Ladwig avers that the trial court abused its discretion when it did not declare a mistrial because of the challenged statements uttered by juror 5. His contention is unfounded.

When an appellant challenges the trial court's denial of a mistrial motion on the basis that such denial led to an unfair trial, we review the denial for abuse of discretion. State v. Rodriguez, 146 Wn.2d 260, 269-72, 45 P.3d 541 (2002).

The only appropriate circumstance for declaring a mistrial is when "the defendant has been so prejudiced that *nothing* short of a new trial can [e]nsure that the defendant will be tried fairly." State v. Gamble, 168 Wn.2d 161, 177, 225 P.3d 973 (2010) (emphasis added). "A mistrial should be granted only when 'nothing the trial court could have said or done would have remedied the harm done to the defendant.'" State v. Gilcrist, 91 Wn.2d 603, 612, 590 P.2d 809 (1979) (quoting State v. Swenson, 62 Wn.2d 259, 276, 382 P.2d 614 (1963), overruled on other grounds by State v. Land, 121 Wn.2d 494, 851 P.2d 678 (1993)). A trial court's denial of a mistrial motion "should be overturned only when there is a substantial likelihood that the prejudice affected the verdict." Gamble, 168 Wn.2d at 177.

Here, the court was presented with a situation in which one juror, juror 5, stated that he knew Ladwig from his volunteer work at the county jail and that he and Ladwig were acquaintances. Based on these statements, and on the statements of other jurors expressing unfavorable opinions regarding methamphetamine use, Ladwig moved to strike the venire panel and declare a mistrial. The court declined to declare a mistrial, stating:

> I do not agree that there's no way to have a fair trial with this jury panel. The Jury Instructions or any limiting instruction can take care of the problems that you remark about.

Ladwig requested no such limiting instruction, nor did he move to strike juror 5 for cause. In fact, when the State moved to strike juror 5 for cause, Ladwig objected, allowing juror 5 to remain in the venire until voir dire was completed. Juror 5 was only dismissed upon the State's, not Ladwig's, peremptory challenge.

13

Plainly, juror 5's statements as to his familiarity with Ladwig did not tend to cause prejudice so great as to warrant a mistrial. The statement that he knew Ladwig from jail did not necessarily indicate that he knew Ladwig as an inmate of the jail as opposed to an employee or volunteer. Similarly, his statements that he knew methamphetamine addicts in the jail did not necessarily indicate that Ladwig was a member of this group. The statement that he had also seen Ladwig once or twice "out on the street" does not lead to the sole inference that he saw Ladwig *living* on the street as opposed to walking or conversing with others. Even if these statements did carry negative implications, they were not so negative as to cause an "enduring and resulting prejudice that could not have been neutralized by an admonition to the jury." State v. Edvalds, 157 Wn. App. 517, 522, 237 P.3d 368 (2010). Any prejudice was entirely curable by a proper jury instruction.[2] The trial court did not err in denying Ladwig's motion for a mistrial.

IV

Ladwig next avers that the prosecutor's questioning of juror 5, as to whether his purported friendship with Ladwig might affect his impartiality, constituted misconduct that deprived him of a fair trial. The record offers no support for this bold claim.

A defendant alleging prosecutorial misconduct bears the burden of proving that the prosecutor's conduct was both improper and prejudicial. State v. Emery,

---

[2] Ladwig's objection to juror 5's dismissal further undercuts his argument that juror 5's statements tended to prejudice the jury. Such an objection would tend to indicate that Ladwig not only believed juror 5's statements were not prejudicial but, further, that he believed juror 5's presence on the panel to be of benefit to him.

174 Wn.2d 741, 756, 278 P.3d 653 (2012). Once a defendant establishes that a prosecutor's statements were improper, the appellate court determines whether the defendant is entitled to relief by applying one of two standards of review. Emery, 174 Wn.2d at 760. The first standard, which applies if the defendant timely objected at trial and the objection was overruled, requires that the defendant show that the prosecutor's misconduct led to prejudice that had a substantial likelihood of affecting the jury's verdict. Emery, 174 Wn.2d at 760.

The second standard applies if the defendant did not object at trial. In that event, the defendant is deemed to have waived the claim of error unless the defendant can show that "(1) 'no curative instruction would have obviated any prejudicial effect on the jury' and (2) the misconduct resulted in prejudice that 'had a substantial likelihood of affecting the jury verdict.'" Emery, 174 Wn.2d at 761 (quoting State v. Thorgerson, 172 Wn.2d 438, 442, 258 P.3d 43 (2011)).

Here, the first standard applies, as Ladwig objected to the prosecutor's questioning. However, Ladwig does not establish that the prosecutor's statements were improper. "Voir dire examination serves to protect the parties' rights to a fair trial by exposing possible biases, both known and unknown, on the part of potential jurors." Kuhn v. Schnall, 155 Wn. App. 560, 574, 228 P.3d 828 (2010).

By the time of the questioning at issue, the prosecutor had already moved to excuse juror 5 for cause, but Ladwig objected, leaving juror 5 on the panel. Accordingly, the State sought to question him further. Juror 5 claimed to be a friend of Ladwig's yet also indicated that he could be impartial. He also claimed

15

that he had heard facts about the case outside of court prior to reporting for jury service.

The prosecutor thus asked juror 5 if he would have greater difficulty convicting a friend as opposed to someone he did not know. When juror 5 stated that he would not, the prosecutor asked whether juror 5 "hope[d] to ever have any friendship with Mr. Ladwig in the future[.]" Juror 5 responded that any friendship was limited to the library at the Island County Jail and that he "encountered Jeromy a couple of times out on the street, but that's about it."

Again, these questions were asked only after the State had already unsuccessfully moved to dismiss juror 5 for cause over Ladwig's objection. Neither party had yet questioned whether juror 5 was capable of being impartial even after he stated that he knew Ladwig. It was neither unreasonable nor improper for the prosecutor to follow up as to a potential bias on the part of juror 5.

Ladwig also does not show any prejudice resulting from this incident. The court indicated that a limiting instruction was an option if Ladwig felt that the jury might be prejudiced by juror 5's remarks. Ladwig did not request such an instruction and juror 5 was later dismissed. In sum, no prosecutorial misconduct took place that would entitle Ladwig to appellate relief.

V

Based on the assignments of error discussed above, Ladwig next argues that he has a right to a new trial due to cumulative error. Cumulative error is established when, taken alone, several trial court errors do not warrant reversal

of a verdict but the combined effect of the errors denied the defendant a fair trial. State v. Hodges, 118 Wn. App. 668, 673-74, 77 P.3d 375 (2003). It is the defendant's burden to prove an accumulation of error of sufficient magnitude to necessitate retrial. In re Pers. Restraint of Lord, 123 Wn.2d 296, 332, 868 P.2d 835, 870 P.2d 964 (1994). Ladwig makes this assertion without support. He has not established any prejudicial error, let alone the several errors necessary to give rise to a ruling of cumulative error. His claim fails.

VI

Finally, Ladwig presents additional issues for our review in a statement of additional grounds. He is entitled to appellate relief on none of them.

First, Ladwig asserts a violation of his right to speedy trial. Both the United States Constitution and the Washington Constitution provide a criminal defendant with the right to a speedy public trial. U.S. CONST. amend. VI; WASH. CONST. art. I, § 22. Our state constitution "requires a method of analysis substantially the same as the federal Sixth Amendment analysis and does not afford a defendant greater speedy trial rights." State v. Iniguez, 167 Wn.2d 273, 290, 217 P.3d 768 (2009). When a defendant asserts the denial of constitutional speedy trial rights, our review is de novo. Iniguez, 167 Wn.2d at 280.

The defendant's constitutional rights to a speedy trial attach when a charge is filed or an arrest is made, whichever occurs first. State v. Corrado, 94 Wn. App. 228, 232, 972 P.2d 515 (1999). Some pretrial delay is often "inevitable and wholly justifiable," Doggett v. United States, 505 U.S. 647, 656, 112 S. Ct. 2686, 120 L. Ed. 2d 520 (1992), and any "inquiry into a speedy trial claim

17

necessitates a functional analysis of the right in the particular context of the case." Barker v. Wingo, 407 U.S. 514, 522, 92 S. Ct. 2182, 33 L. Ed. 2d 101 (1972). Accordingly, our Supreme Court has adopted "an ad hoc balancing test that examines the conduct of both the State and the defendant to determine whether speedy trial rights have been denied." Iniguez, 167 Wn.2d at 283. As first articulated by the United States Supreme Court in Barker, to be considered are: (1) the length of pretrial delay, (2) the reason for the delay, (3) the defendant's assertion of his or her right, and (4) prejudice to the defendant. 407 U.S. at 530.

Before trial, Ladwig moved to dismiss the case on the basis that his rights to counsel of his choice, and to a speedy trial, were both violated. The court postponed hearing the motion until after trial. After hearing argument, it denied the motion, stating as to the speedy trial argument:

> As to the . . . constitutional right for a speedy trial, . . . I looked over all of the transcripts for the continuances. And all of them, with the exception of the one that was remarked by [the prosecutor], were agreed upon.
> Either agreed upon or—Well, they all were agreed upon. Or they were initiated by the Defendant or the Defendant's attorney.
> And there are certainly, as [the State] points out, the—the Defendant and the Defendant's attorney move as one. And in this case the Defendant is deemed to have waived his speedy trial rights.

The court then discussed the reasons both parties sought continuances, which pertained primarily to the complexity of the case and the need to arrange for expert witnesses. In one instance, the court noted, a continuance was requested because Ladwig's attorney fell ill. The court then conducted the following Barker analysis:

So let's go back to the Barker factors. The reason for the delay, all of them are reasonable. All of them were things that happen in a case that you just can't anticipate—can't anticipate because they're based on perhaps witness unavailability, the investigation of obtaining additional discovery, prepare for trial.

Whenever I hear an attorney say I need—"I'm not prepared for trial," I have to think he's telling me he's not prepared for trial. And that there's a good reason for that. And, usually, you go ahead and tell me about a witness or—or some sort of delay.

The 21 months over and over I was told or somebody was told in this case that this is a complex case and we need more time. And so there was continuances given.

Not mostly—Not for the prosecution, but mostly for the defense because it was a complex case. And there were many factors that—and many experts that everybody had to contact and—and depose and look at.

So the reasons were well-accepted reasons to continue a trial.

The extent to which the Defendant asserted his speedy trial rights. Yes, there were a couple of times when you asserted in trial or in a hearing, excuse me, as far as we could tell was that the box had not been marked.

But, again, those continuances had been agreed upon.

But the assertion of the speedy trial rights has to be—It didn't occur within that 10-days requirement.

Okay. Then the last is the prejudice to the Defendant as a result of the delay. The only one that the Court can possibly say prejudiced the Defendant was the—his father had a stroke and wasn't able to testify in this case. . . .

[The court then noted that the upshot of Ladwig's father's testimony would have been contradicted by Ladwig's expert witness.]

So looking at all the Barker factors, I don't see that his—his rights were prejudiced. . . .

I'm going to deny the Motion to Dismiss for all those reasons, as well as the motion for—that I see here to dismiss because of—or at least give him another trial where he acts as his own attorney. I'm—I'm denying that.

Thus, the trial court actually went further than simply stating Ladwig had

waived his speedy trial rights when his attorney requested a continuance. The

court analyzed Ladwig's case pursuant to the Barker factors and found that no

infringement of the right to a speedy trial took place. Nothing in Ladwig's appeal dissuades us from accepting the trial court's conclusion.[3]

Next, Ladwig argues that he was deprived of his right to counsel of his choice. The trial court granted Ladwig's motion for substitution of counsel when Ladwig expressed dissatisfaction with the appointed public defender. When a party receives the remedy he has requested, "[t]he law presumes that these remedies are effective." State v. Giles, 196 Wn. App. 745, 769, 385 P.3d 204 (2016). Ladwig makes no showing to the contrary.

In arguing otherwise, Ladwig directs us to Faretta v. California, 422 U.S. 806, 95 S. Ct. 2525, 45 L. Ed. 2d 562 (1975). Therein, the United States Supreme Court held that the state may not force a lawyer upon a defendant who insists upon representing himself. Faretta, 422 U.S. at 807. However, here, Ladwig requested a substitution of counsel. As the trial court stated, "The case here is [Ladwig] never said 'I want to represent myself.' He said he wanted a new attorney." Thus, Faretta is of no help to Ladwig, and his argument is meritless.

Ladwig also claims that members of the public were excluded from his trial, in contravention of his right to a public trial as set forth in article I, section 22 of the Washington Constitution and State v. Bone-Club, 128 Wn.2d 254, 906 P.2d 325 (1995). Because the record does not show that the courtroom was ever actually closed to the public, we will not further analyze this claim.

---

[3] Similarly, Ladwig does not show that his rights to a timely trial under CrR 3.3 were violated. To the contrary, the trial court correctly calculated the time to trial periods applicable to Ladwig's case.

20

Ladwig's remaining claims, at least those pertinent to this appeal, assign error to the weight given to certain evidence at trial and purported contradictions in witness testimony. These issues were reserved to the trier of fact.

Finally, Ladwig's averments of other past wrongful convictions are outside the scope of this appeal.

Affirmed.

_____
Dwyer, J.

WE CONCUR:

_____        _____
Smith, J.                                                    Leach, J.